[No. 25813. *En Banc.* December 7, 1936.]

C. A. BLANCHARD *et al., Respondents,* v. GOLDEN AGE BREWING COMPANY *et al., Defendants,* HARRY DAIL,. *Appellant.*[1]

¹Reported in 63 P. (2d) 397.

398

*Vanderveer & Bassett,* for appellant.
*John F. Dore,* for respondents.

STEINERT, J.—This is an appeal from a judgment pronouncing an individual in contempt of court and assessing a fine against him for violation of co-ordinate restraining orders issued simultaneously in four cases, each involving an alleged labor dispute.

The case, as a whole, is somewhat unusual in that the original dispute was not between employers and their respective employees, but between two labor factions, one of which included certain members of a particular union, and the other of which included representatives of another union, the employers subsequently becoming involved against their will and by force of dominant circumstances. An added peculiarity of the case comes about from the fact that the theory upon which the actions were originally brought has been considerably restricted and limited, since the trial of the particular matter in issue, by reason of a recent decision of the United States supreme court.

Respondents, aggregating seventy-seven individuals, are members of United Brewery, Flour, Cereal, and Soft Drink Workers of America, a labor union affiliated with the American Federation of Labor, and

hereinafter referred to as the brewery workers' union. At, and for some time prior to, the time of the commencement of these actions, respondents were in the employ of one or another of the four brewery companies named as defendants herein. Another defendant, International Brotherhood of Teamsters, Chauffeurs, Stablemen, and Helpers of America, hereinafter referred to as the teamsters' union, is also a labor union holding a charter from the American Federation of Labor. Four other defendants are branch, or local, unions of the teamsters' union. Dave Beck, also a defendant, is an officer of the teamsters' union. Harry Dail, the appellant, is the business representative of one of the defendant teamster unions and, as such, had charge of the northwest district; he was not, however, originally a party to this litigation.

In the background of these actions is the history and memory of a violent dispute between the two large parent unions, above named, with respect to jurisdiction over truckers and teamsters employed in the brewing industry. Up until the summer of 1933, the brewery workers' union had maintained, with practical success, in this state, their claimed right of control over such truckers and teamsters. Lately, however, this was in the face of several decisions of the executive council and of the convention of the American Federation of Labor, which awarded jurisdiction over the truckers and teamsters to the teamster's union.

A serious situation was thus developed, and, in consequence, trouble between the two large unions ensued. In the offing, moreover, was inevitable trouble for the various breweries with one, or both, of the two large unions and their subsidiaries. Apprehension of strikes, actual or threatened, soon became a certainty, for, as a result of the strife between the two parent

unions over the matter of jurisdiction regarding truckers and teamsters, the brewery workers' union called a series of strikes against a brewery in Seattle. This precipitated litigation between the brewery and that union, in the course of which the brewery owners, as plaintiffs, obtained a temporary injunction against the brewery workers and, later, a judgment declaring the strike unlawful and permanently enjoining it.

In the meantime, and before the trouble had reached the point of litigation in Seattle, Congress, on June 16, 1933, passed what is commonly known as the National Industrial Recovery Act. 48 Stat. 195; Title 15, U. S. C. A. § 701 *et seq.* That act provided, among other things, for the adoption of codes of fair competition by trade or industrial groups, on approval by the President. Section 7 (Title 15, U. S. C. A. § 707) (a) of that act provided that employees should have the right to organize and bargain collectively through representatives of their own choosing, free from interference, restraint, or coercion of employers *or their agents,* and that no employee should be required, as a condition of employment, to join any company union or to refrain from joining any labor organization of his own choosing. The passage of that act added further complications to the conditions existing between the unions, as will presently appear.

Pursuant to the Federal act, the brewing industry adopted a code, effective December 4, 1933, which was about the time of the Seattle trouble. The code contained provisions identical with those above referred to as parts of § 7(a) of the National Industrial Recovery Act, and also a provision that the employees of the brewing industry in each region should, by election, name two members to represent them in labor negotiations with the respective owner managements. The state of Washington was grouped with a number

of other states in Region 17. Further reference to the proceedings that were subsequently taken under the code will be reserved for its proper chronological position in our statement of the case.

In December, 1933, the issue between the teamsters' union and the brewery workers' union was brought within one step of the situation which caused the ultimate conflict. On December 29th, Pacific Northwest Breweries Association, a corporation embracing twenty-seven breweries and their subsidiaries located in Region 17, and eight individual representatives, allegedly acting for all unions who should conform to the decisions of the American Federation of Labor respecting matters of craft jurisdiction, entered into a written agreement which provided, among other things, that all work connected with the manufacture and distribution of the products of the association should be performed by members in good standing of the various unions *having jurisdiction over such work.* This agreement, of course, favored the position taken by the teamster's union and was contrary to the claims upon which the brewery workers' union was insisting. Naturally, the brewery workers' union refused to be bound by that agreement.

The finishing touch to the situation then existing between the two unions was accomplished on January 17, 1934, when the above-named contracting parties entered into a supplemental written agreement which provided that, upon "the expressed desire" of the association officially communicated in writing, "the unions interested" would immediately demand that the brewery workers' union agree to observe the conditions of the agreement of December 29, 1933, and that, upon its refusal so to do within ten days, the teamsters' union would organize the inside brewery workers and accept their affiliation, if tendered. Under

this supplemental agreement, the only recourse left to the members of the brewery workers' union was either to relinquish their claims to jurisdiction over truckers and teamsters or else to disassociate themselves from their own union and join the teamsters' union.

Subsequent to the execution of the supplemental agreement, practically all of the breweries in western Washington were operated by employees who were members of the teamsters' union. As a result, boycotts were instituted by the brewery workers' union against the products of western Washington breweries. In retaliation, the members of the teamsters' union limited their personal purchases of beer to the products of the same breweries.

With the stage thus set, the scene of events next moved to Spokane, where a number of breweries, including those of the defendant brewing companies herein named, were located. The same conditions as those already outlined above, with reference to conflict of jurisdiction, obtained in that area. While trouble had not yet reached an acute stage, it gave full promise of eventually producing the same results.

Up to this time, however, there had been no immediate trouble or disagreement between the Spokane breweries, defendants herein, and any of their employees, whether brewery workers or teamsters. Wages, hours and conditions of employment, as between employers and employees, were satisfactory to all parties concerned. The situation, however, was rapidly becoming ominous, and, for the brewing companies, perilous, because of the fact that neither of the two large unions would recognize the claims of the other, both insisting upon their respectively asserted rights. Strikes were inevitable, and the only

question was when and by whom actual conflict would be precipitated.

In July, 1934, at an election held pursuant to the code provisions above mentioned, two members of the brewery workers' union were elected to represent the brewery employees in their labor negotiations with the brewery owners. At the same election, defendant Beck, a member of the teamsters' union, was a candidate, but was defeated. The results of that election indicated the stand of the brewery workers' union and made ultimate conflict a foregone conclusion.

On December 11, 1934, the American Federation of Labor, through its president, sent a telegraphic communication to one of the brewery workers employed by one of the defendant brewing companies to the effect that the Federation had granted to the teamsters' union jurisdiction over the truck drivers and teamsters, and to the brewery workers' union jurisdiction over the inside workers and bottlers; further, that the Federation would regard any attempt of the teamsters' union to force inside workers, bottlers and brewers to join the teamsters' union as a transgression upon the jurisdiction of the brewery workers' union.

From this point, matters moved to a swift conclusion. In the latter part of November or the early part of December, 1934, the teamsters' union began to make demands upon the different brewing companies located in Spokane that they comply with the supplemental agreement of January 17, 1934. Compliance with that agreement involved the discharge by the brewing companies of all employees who were members of the brewery workers' union and the substitution throughout their plants of employees who were members of the teamsters' union. Failure to comply with the demands meant that the teamsters' union would call a strike.

The officers of some of the Spokane breweries thought that they were not bound by the supplemental agreement of January 17, 1934, inasmuch as they had not signed it; others apparently thought that they were. At any rate, the pressure was so great and the certainty of strikes and possible boycotts was so imminent that the brewery owners concluded that it would be the better policy to comply with the demands and, consequently, indicated that they would do so.

It may be well to note, at this point, that the conflict had thus reached the stage where it was no longer a dispute merely as to jurisdiction over teamsters and truckers, but where the teamsters' union was proposing and intending to exercise jurisdiction over the entire plants, both as to inside and as to outside workers, contrary to the express decision of the American Federation of Labor.

It was under these circumstances, that these four actions were commenced by various employees, members of the brewery workers' union, to enjoin the employers and the teamsters' union from proceeding under the agreement of January 17, 1934, or from discharging, or attempting to force the discharge of, the brewery workers. The complaint was drawn, in large part, upon the theory that the action of the defendant brewing companies and the teamsters' union was in violation of the brewers' code, above mentioned, in that the brewery workers were denied the right to select their own representatives and through them to deal with their employers. In addition to that, however, the complaint alleged that, although the relations of the brewery workers with their employers had been harmonious in every respect, the teamsters' union, by threats of strikes and boycotts, and for the purpose of procuring the discharge of the brewery workers, had coerced the defendant brewing companies

into demanding that the brewery workers should join the teamsters' union or else suffer the loss of their jobs by being discharged; and also alleged that, unless restrained, the demands of the teamsters' union would, by the same means, be carried into effect. It was further alleged that the brewing trade was the sole means of livelihood of the brewery workers and that it was the intention of the teamsters' union to black-list them and prevent them from securing employment in their trade anywhere in Spokane.

Upon the verified complaint, supported by an affidavit which reiterated the above charges at length, the court issued, in each of the four cases, an order restraining the brewing companies from coercing, or by threats attempting to force, their employees into joining the teamsters' union, or from threatening to discharge them if they did not select labor representatives agreeable to the brewing companies, or from dealing with any representatives other than those which had been selected under the provisions of the code; the order further restrained the teamsters' unions and the defendant Beck from attempting, in any manner, to coerce the respondents into joining the teamsters' union or from calling any strike or declaring any boycott for the purpose of so coercing the respondents, or from doing any acts by coercion to prevent the respondents from being represented by the persons selected by them.

The brewing companies and the teamsters' union appeared in the various actions and filed demurrers to the complaints and also motions to dissolve the respective restraining orders. The motions were based on five grounds: (1) that the court had no jurisdiction to enter the orders; (2) that the plaintiffs [respondents] had no capacity to maintain the actions; (3) that plaintiffs had failed to yield obedience to

the decisions of the American Federation of Labor; (4) that the matters in controversy had grown out of a labor dispute and that plaintiffs had failed to make any effort to settle the dispute, either by negotiation or by aid of the machinery provided by Federal and state statutes; and (5) that the complaints were without equity and that, by the issuance of the restraining orders, much greater injury had been, and would be, inflicted upon the defendants than would result to the plaintiffs from the dissolution of the orders. The motions were based upon the files and records of the causes and upon certain accompanying affidavits. After a hearing on the affidavits, the court denied the motions and directed that the restraining orders continue in force and effect pending the litigation. No appeal was taken from that order.

A few days thereafter, respondents made application to the court for a citation against appellant Dail, defendant Beck, and also Frank Brewster, for contempt for violation of the restraining orders. The court thereupon issued an order directing not only the three individuals just named but also the teamsters' union and three of the defendant brewing companies to appear and show cause why they should not be punished for contempt of court because of such violation. The order was never served upon Beck or Brewster, and they are, therefore, not involved in this particular proceeding. Dail and the three brewing companies appeared and demurred to the affidavits in support of the citation. The demurrers of the brewing companies were sustained, that of Dail was overruled.

Considerable evidence was then offered by the opposing parties. Without going into detail, it is sufficient to say that there was ample evidence to the effect, and the court found, that Dail, although not

originally a party to the actions or to the restraining orders, well knew of the existence of such orders and their terms of restraint; that he nevertheless insisted, by positive demands, that the brewing companies carry out the agreement of January 17, 1934, despite, and contrary to, the order of the court, stating that, if his demands were not complied with, an attack would be made in violation of the orders, and stating, further, that the teamsters' union would attempt to induce the engineers' union, members of which were in the employ of the brewing companies, to institute a strike against them; that Dail did call a strike of the teamsters' union and that the call was obeyed. The court thereupon adjudged Dail guilty of contempt of court and assessed a fine of one hundred dollars and costs. From that order, this appeal was taken.

The appellant contends that the restraining orders were utterly void, for three reasons, and that the citation for contempt was also void for still other reasons.

The first two grounds of attack upon the restraining orders are: (1) That the court had no jurisdiction of the subject matter of the actions, and (2) that the respondents had no capacity to maintain the actions. Both of these grounds rest upon § 3(c) of the National Industrial Recovery Act, which vests jurisdiction of matters pertaining to violations of the code in the district courts of the United States, and authorizes the several district attorneys, acting under the direction of the attorney general, to institute proceedings with reference thereto. It is appellant's contention that, if the actions could be maintained at all, they could be maintained only by a district attorney in a district court of the United States.

Subsequent to the time of the trial of this matter below, the United States supreme court held § 3 of the National Industrial Recovery Act unconstitutional.

*Schechter Poultry Corp. v. United States,* 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947. The effect of that decision, so far as we are here concerned, was to eliminate from the complaints all phases of the case based upon the code provisions of the Federal act and, likewise, to eliminate appellant's contentions in connection therewith.

The third ground of attack upon the restraining orders is that, inasmuch as the matters in controversy grew out of a labor dispute within the meaning of the so-called "Labor Disputes Act," Laws of 1933, Ex. Ses., p. 10 *et seq.,* Rem. Rev. Stat. (Sup.), §§ 7612-1 to 7612-15 [P. C. §§ 3467-21 to 3467-35], inclusive, the issuance of the restraining orders was prohibited by numerous provisions of that act. This presents one of the two principal, and vital, questions in the case.

In answer to appellant's attack upon the restraining orders, respondents contend that no "labor dispute" is involved here, their contention apparently being that there was no dispute of any kind between the *employers* and any of their *employees.* In support of their contention, respondents rely upon *Safeway Stores, Inc. v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372.

In that case, it was held that a controversy between a labor union and an employer of persons not members of that union, wherein the labor union was demanding that the employer urge and coerce its employees to join the labor organization, did not constitute a labor dispute, within the meaning of the labor disputes act. The case here, however, is distinguishable from that case in several particulars: (1) In this instance, there was a dispute between two factions, each of whom represented employees working for a common employer. (2) Here, also, was a question, at least indirectly involved, of the conditions under which one

faction or the other would continue in the employment of the common employer. (3) In this action, it is not the employer, but one set of employees, that is seeking the injunction; and (4) the employers did not remain aloof, as in the *Safeway* case, but, whether voluntarily or involuntarily, injected themselves, or permitted themselves to be injected, into the controversy between the immediate disputants. We think that these facts, taken together, are sufficient to constitute a "labor dispute."

The question now presented to us is whether the court had power and authority to issue the restraining orders. Appellant rests his contention that the court had no such power or authority on chapter 7, Laws of 1933, Ex. Ses., p. 10, § 1, Rem. Rev. Stat. (Sup.), § 7612-1 [P. C. § 3467-21], which is a part of the labor disputes act. That section reads as follows:

"No court of the State of Washington or any judge or judges thereof shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, *except in a strict conformity with the provisions of this act;* nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this act." (Italics ours.)

According to § 2 of the act, Rem. Rev. Stat. (Sup.), § 7612-2 [P. C. § 3467-22], it is the public policy of this state that the worker, though he should be free to decline to associate with his fellows, should likewise have full freedom of association, self-organization and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and should be free from interference, restraint or coercion of employers of labor, *or their agents,* in the designation of such representatives or in self-organization or in other concerted activities for

the purpose of collective bargaining or other mutual aid or protection. It is the contention of the respondents herein that the teamsters' union is to be considered as the agent of the employers with respect to the coercive acts committed.

Section 4 of the act, Rem. Rev. Stat. (Sup.), § 7612-4 [P. C. § 3467-24], provides:

"No court of the State of Washington shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute or prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 7612-3 of this act;

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute any strike or unemployment benefits or insurance or other moneys or things of value;

"(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any state;

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 7612-3 of this act."

Section 7 of the act, Rem. Rev. Stat. (Sup.), § 7612-7 [P. C. § 3467-27], provides that no court of the state of Washington or any judge or judges thereof shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, except after hearing the testimony of witnesses in open court and finding of facts by the court to the effect that (a) unlawful acts have been threatened and will be committed unless restrained or have been committed and will continue unless restrained; (b) that substantial and irreparable injury to complainant's property will follow; (c) that, as to each item of relief granted, greater injury will be inflicted upon the complainant by denial of the relief than will be inflicted on the defendants by granting the relief; (d) that complainant has no adequate remedy at law; and (e) that the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

Section 8 of the act, Rem. Rev. Stat. (Sup.), § 7612-8 [P. C. § 3467-28], provides:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery or mediation or voluntary arbitration."

Section 9 of the act, Rem. Rev. Stat. (Sup.), § 7612-9 [P. C. § 3467-29], provides that no restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute,

except on the basis of findings of fact made by the court, and that every such order or injunction shall include prohibition of only such specific acts as are complained of in the complaint and expressly included in the findings.

Section 13 of the act, Rem. Rev. Stat. (Sup.), § 7612-13 [P. C. § 3467-33], defines comprehensively what shall be considered a labor dispute. It is unnecessary to set out this section, inasmuch as we hold that, under the facts of this case, a labor dispute is involved.

The precise question before us, under the facts of the entire case, is whether the legislature can abolish or abridge the power of the superior court to issue injunctions, or regulate that power in specific classes of disputes in such a way as will, to that extent, abolish or abridge the power. We hold that it cannot, because to do so would be an encroachment upon the judicial power.

In making this pronouncement, we do not declare generally, or even intimate, that workingmen have not the right to cease work, or to strike, or in a lawful way to call a strike and persuade others to join them. Such rights have, by all courts, been so often and so uniformly held to exist that citation of authority is almost unnecessary. We ourselves have emphatically so held. *Jensen v. Cooks' & Waiters' Union*, 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302; *Pacific Coast Coal Co. v. Dist. No. 10, United Mine Workers of America*, 122 Wash. 423, 210 Pac. 953.

Nor is it intimated, or to be inferred, that the court has unbounded or untrammeled power in such matters. The real question is one of jurisdiction of the superior court, that is, jurisdiction to exercise its sound discretion upon the particular facts presented, a discretion subject to review for manifest abuse. By "juris-

diction'' is meant the power to hear and determine, regardless of whether the ruling made in the particular case be correct or incorrect. *State ex rel. Mc-Glothern v. Superior Court,* 112 Wash. 501, 192 Pac. 937.

By way of introduction to the theory upon which we proceed, we quote the following paragraph from *Kilbourn v. Thompson,* 103 U. S. 168, 26 L. Ed. 377:

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the power appropriate to its own department and no other.''

The constitution of this state, modeled upon the supreme law of the land, has ''blocked out with singular precision, and in bold lines'' the distribution and limitation of governmental powers to the executive, legislative, and judicial departments of the state, respectively. The legislative powers are vested in the two bodies composing the legislature, with the power of initiative and referendum reserved to the people. Art. II, § 1 (seventh amendment). The executive department consists of the governor and a number of elective officials, Art. III, § 1, but with supreme executive power vested in the governor. Art. III, § 2; *State ex*

*rel. Hartley v. Clausen,* 146 Wash. 588, 264 Pac. 403. The judicial power is allocated, in Art. IV, as follows:

"The judicial power of the state shall be vested in the supreme court, superior courts, justices of the peace, and such inferior courts as the legislature may provide." Art. IV, § 1.

"The superior court shall have original jurisdiction in all cases in equity . . . Said courts and their judges shall have power to issue writs of mandamus, quo warranto, review, certiorari, prohibition, and writs of habeas corpus . . . Injunctions and writs of prohibition and of habeas corpus may be issued and served on legal holidays and nonjudicial days." Art. IV, § 6.

The division of sovereignty into three branches and the investiture of all judicial power in the courts, as prescribed by the constitution, have been recognized and affirmed by this court on repeated occasions. We quote from several decisions.

"Each of the three departments into which the government is divided are equal, and each department should be held responsible to the people that it represents, and not to the other departments of the government, or either of them." *State ex rel. Reed v. Jones,* 6 Wash. 452, 461, 34 Pac. 201, 23 L. R. A. 340.

"Under such a distribution the judiciary cannot take upon itself the functions of the legislature, nor can the legislature do that which properly belongs to a court." *Maynard v. Valentine,* 2 Wash. Ter. 3, 11, 3 Pac. 195.

"The State of Washington is a sovereign whose written constitution is her visible charter. By the constitution all the judicial power (which is a distinct branch of the sovereignty) is vested in the courts therein created, independently of all legislation. The jurisdiction of these courts is universal, covering the whole domain of judicial power; even to that growing out of the supposed existence of municipal ordinances." *In re Cloherty,* 2 Wash. 137, 139, 27 Pac. 1064.

In *State ex rel. Roseburg v. Mohar,* 169 Wash. 368, 13 P. (2d) 454, we had occasion to consider the question of the power of the legislature to divest the court of its jurisdiction over irrigation disputes and contests over water rights. We said, at page 375:

"Even if the legislature had attempted by the terms of the water code to divest the courts of their jurisdiction in such cases, we do not think it could successfully do so. The constitution of this state has clothed the superior court with original jurisdiction in all cases in equity, . . . Const., Art. IV, § 6. The superior court has all the powers of the English chancery court. *State ex rel. Burrows v. Superior Court,* 43 Wash. 225, 86 Pac. 632. The jurisdiction of equity to entertain suits for quieting title to the use of waters is well settled. The courts have plenary power to settle such disputes . . ."

Thus, by the constitution, and independently of any legislative enactment, the judicial power over cases in equity has been vested in the courts, and, in the absence of any constitutional provisions to the contrary, such power may not be abrogated or restricted by the legislative department. Any legislation, therefore, the purpose or effect of which is to divest, in whole or in part, a constitutional court of its constitutional powers, is void as being an encroachment by the legislative department upon the judicial department.

The writ of injunction is the principal, and the most important, process issued by courts of equity, it being frequently spoken of as the "strong arm of equity." Its function is to furnish preventive relief against irreparable mischief or injury. Its object and purpose is to preserve and keep things *in statu quo* until otherwise ordered, and to restrain an act which, if done, would be contrary to equity and good conscience. 14 R. C. L. 639. The granting or withholding of an interlocutory injunction is addressed to the sound dis-

cretion of the court, to be exercised according to the circumstances of the particular case. While utmost care and caution are to be observed in the exercise of the jurisdiction, and while the relief sought is to be granted only upon a clear showing of necessity in order to afford immediate protection of a complainant's right, yet, when these essentials have been satisfied, it is the duty of the court to exercise its equity power and grant the necessary relief.

In the light of the foregoing constitutional provisions and equity principles, we turn our attention to the act under consideration.

From beginning to end, it breathes the spirit of limitation upon the jurisdiction of the court. Its title, by its very terms, announces a limitation on ''the powers of the courts of this state.'' Section after section begins with the formula that

''No court of the State of Washington or any judge or judges thereof shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute,''

except under the restrictions imposed by the act. If the act has any purpose at all, manifestly it is to deprive the courts of the equity powers which they had customarily and rightfully been exercising.

It is no answer to say that the act seeks to prevent the courts from enjoining workingmen from doing what they have the right to do. In so far as the act denominates such rights as are lawful, it is but declaratory of what the law has been in this state for many years.

Employment is based upon contract, whether written or oral, and whether for a term or at will. Under such contracts, the rights of employer and employee are correlative. The correlative rights of employers

and employees are discriminatively discussed in *American Steel Foundries v. Tri-City Central Trades Council*, 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360, which involved § 20 of the Clayton act. In that case, an injunction was sought to enjoin a labor union and fourteen individual defendants from carrying on a conspiracy to prevent the complainant from retaining and obtaining skilled laborers to operate its plant. The district court, upon final decree permanently enjoined the defendants from using persuasion, threats, or violence, in connection with a strike in progress against complainant and its business. The circuit court of appeals modified the decree by striking out the word "persuasion" and inserting, after the clause which restrained picketing, the words "in a threatening or intimidating manner."

The supreme court affirmed the decree of the circuit court in so far as the elimination of the word "persuasion" was concerned, but reversed the decree as to the insertion made, holding that it was inadequate, in that it left compliance largely to the discretion of the pickets. Touching the question of the correlative rights of employer and employees, the court held that it was not unlawful for a labor organization, by persuasion and appeal, to induce a strike against low wages. But the court also very emphatically held that if, in their attempts at persuasion or communication with those whom they would enlist with them, those of the labor side adopted methods which, however lawful in their announced purpose, inevitably lead to intimidation and obstruction, it was within the power of the court, and therefore became its duty, to so limit the propagandists as to time, manner, and place as would prevent infractions of the law and violation of the rights of employers and employees. The court

further recognized that the power of an equity court was to be exercised according to the necessities of the case. This language appears:

"Each case must turn on its own circumstances. It is a case for the flexible remedial power of a court of equity which may try one mode of restraint, and if it fails or proves to be too drastic, may change it."

This case is a forceful, as well as an enlightening, authority, upon the powers of a court of equity. It recognizes that the court is possessed of remedial power, that such power is flexible, and that it may accommodate the remedy to the circumstances presented. It recognizes, further, that, where the court of first instance abuses its discretion, it is subject to correction by the appellate court.

Nor is it any answer to a condemnation of the statute to say that the act, in part, merely prescribes a procedure to be followed by the courts in such matters. Undoubtedly, the legislature may prescribe reasonable regulations governing court procedure. *Record Pub. Co. v. Monson,* 123 Wash. 569, 213 Pac. 13. As a matter of comity between the separate departments of government, the courts will always recognize reasonable regulations prescribed by the legislature, even though they may seemingly have the appearance of being restrictions. But the courts are not required to recognize a legislative restriction which has the effect of depriving them of a constitutional grant or of one of their inherent powers. What the legislature has not given, it cannot take away. The legislature cannot indirectly control the action of the court by directing what steps must be taken in the progress of a judicial inquiry, for that is a judicial function. *Stephens v. Cherokee Nation,* 174 U. S. 445, 478, 19 S. Ct. 722, 43 L. Ed. 1041; *In re Hagan,* 295 Mo. 435, 245 S. W. 336.

Nor, again, is it any answer herein to say that there is no vested right in a particular form of remedy. It is not a question of the *right* of a litigant to a particular remedy, but, rather, a question of the *power* of the court to employ a particular form of remedy necessary to protect a right. In this connection, it may be observed that there is a vital distinction between legislative abolition of causes of action and a legislative interference with the judicial processes respecting an *existing* cause of action. This distinction was drawn in the recent case of *Shea v. Olson*, 185 Wash. 143, 53 P. (2d) 615, in the following language appearing on page 157:

"The final ground of the contention is that the act violates Art. IV, §§ 1 and 6 of the state constitution, relating to the judicial powers of the state. The act does not assume to *interfere with any power of the court*. What it does is to abolish certain causes of action. The power of a court is not invoked until a cause comes before it, and terminates when the action ceases. The judicial power is not affected merely because litigation decreases or a certain type of litigation is abolished." (Italics ours.)

In our opinion, §§ 7, 8, and 9 of the labor disputes act (Rem. Rev. Stat. (Sup.), §§ 7612-7, 7612-8, 7612-9 [P. C. §§ 3467-27, 3467-28, 3467-29]) constitute an encroachment upon judicial power, and are therefore unconstitutional.

Sections 7 and 9 make jurisdiction to depend upon oral testimony of witnesses and formal findings by the court. Whatever may be said as to the advisability of following that procedure in any particular case, it does not confer jurisdiction, nor does its absence defeat jurisdiction. The court takes jurisdiction when the cause is brought before it, and may dispose of the case in the manner in which causes of equitable cognizance are disposed of.

Section 7 (c) of the act requires a finding of the balance of conveniences and injuries as to each item of relief granted. While a court of equity, in exercising its jurisdiction, may, and usually does, take into consideration the balance of conveniences and injuries as between the litigants, the court is not dependent upon that consideration for the maintenance of its jurisdiction.

Section 7 (e) of the act requires a finding that the public officers charged with the duty of protecting complainant's property are unable or unwilling to furnish adequate protection. This subdivision has a two-fold vice: (1) It makes a finding to that effect an essential to jurisdiction, and (2) it makes the power of the court dependent upon the inability or unwillingness of public officials to function. One whose rights are invaded and who is faced with an irreparable injury is not required to seek the grace, or to await the pleasure and consequent delay, of public officers. He is not required to argue his case or to address his importunities to a policeman, nor is such officer to be expected to determine the civil rights of a litigant. The proper forum for such matters is the court.

Section 8 of the act makes the issuance of a restraining or injunctive order dependent upon a preliminary negotiation or voluntary arbitration. One who is injured or threatened with irreparable injury is not required to negotiate concerning it or attempt to arbitrate it. He has the right to seek the intervention of a court of equity.

The complaints in this case alleged, and the affidavits considered at the hearing were sufficient to establish, that the brewing company owners were attempting to coerce the respondents into joining the teamsters' union by threats of discharge if the respondents did not comply, and that the teamsters'

unions were aiding and impelling such action on the part of the owners by threats of strikes and boycotts unless the owners carried out their attempts.

The action of the owners was contrary to the public policy announced in the very legislative act on which all of the defendants formerly relied and on which the appellant even now relies. But the case goes deeper than that. It is a case where it has been made to appear that one set of employees, through threats of strikes and boycotts, is seeking to compel a group of employers to discharge another set of employees whose relations with their employers have been in all respects harmonious. This is unwarranted. No one has a right to coerce an employer, by threats of violence or of activities which will inevitably lead to great financial loss, in order to compel the discharge of an employee.

The following language from *Safeway Stores, Inc. v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372, is apt and applicable to the present situation:

"What right have the respondents [members of a labor union] to insist or demand, at the threat or cost of the destruction of appellant's business, *or at all,* that appellant ask, urge or coerce, directly or indirectly, its employees, who are at liberty to do as they please, to join respondents' organization? Of course, there is nothing unlawful in hiring clerks or salesmen who are not members of a local organization such as the respondent; and any attempt, like that in this case, to deny or cripple one's right to do so is an unwarranted attempt by individuals or persons to unreasonably interfere with the freedom of the liberty and property right of contract." (Italics ours.)

The right to earn a livelihood and to continue in employment unmolested by unwarranted activities of third persons is entitled to protection in equity. *Truax v. Raich,* 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, Ann. Cas. 1917B, 283. A correlative principle is that the

employer has the right freely to maintain relations of employment with whomsoever he desires, and no one has the right purposely to disrupt or interfere with those relations by the intentional resort to such measures as will obviously, and in the ordinary course of events, inflict irreparable injury upon the employer. *Hitchman Coal & Coke Co. v. Mitchell*, 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, Ann. Cas. 1918B, 461. Both of the cases just cited are authority for the further rule that it is immaterial whether the employment be for a term or at will.

For the reasons that we have given herein, we hold that there was no error in the refusal to dissolve the restraining orders or in converting them into temporary injunctions.

There yet remains the matter of the contempt proceeding. Appellant contends that the citation was void for two reasons: (1) Because it was not accompanied by the affidavits on which it was issued and did not identify the affidavits with sufficient certainty to appraise the appellant of their contents; and (2) that the citation charged appellant with violation of *the* restraining order, whereas there were four such orders. Appellant also contends that he was entitled to a jury trial, as provided in Rem. Rev. Stat. (Sup.), § 7612-11 [P. C. § 3467-22].

We do not consider the first reason above given a valid one. Appellant did not appear specially, nor did he ask for a continuance on the ground of surprise or lack of information. To the contrary, he demurred to all the affidavits. More than that, the contempt proceeding was not tried on affidavits, but upon a full hearing of the oral testimony offered by both sides.

The second reason above given has still less force. There were four restraining orders issued instead of one, merely because there were four cases.

The several orders were identical in form, except that each named the particular brewing company involved in the particular action. The citation for contempt was entitled in all four cases. Although the cases were never formally consolidated upon the hearing for the restraining orders, they were all heard at the same time. Appellant was in no way prejudiced by the fact that only one contempt proceeding, instead of four, was subsequently had for the violation of all four restraining orders.

The principal attack made upon the contempt proceeding is that appellant was denied the right of trial by jury. This is the second vital question in the case. In view of what we have already said with respect to the power of a court of equity, this question requires but brief discussion.

The power of a court, created by the constitution, to punish for contempt for disobedience of its mandates, is inherent. The power comes into being upon the very creation of such a court and remains with it as long as the court exists. Without such power, the court could ill exercise any other power, for it would then be nothing more than a mere advisory body. In *State ex rel. Dailey v. Dailey,* 164 Wash. 140, 2 P. (2d) 79, an individual was charged with, and fined for, contempt of court for failure to comply with the court's decree. On appeal, he contended that he was entitled to a jury trial under chapter 249, Laws of 1900, p. 925, § 120 (Rem. Rev. Stat., § 2372 [P. C. § 8786]), which makes willful disobedience of the lawful process or mandate of a court a misdemeanor. Upon that question, we said:

"Appellant's contention that, the proceeding being in its nature essentially criminal, he was entitled to a jury trial, is not well taken. It has always been held that the power of the court to punish for such contempts as those defined in § 120 of the criminal code

above referred to, inheres in the court itself, and that on appropriate occasion such punishment may be summary. The dignity of the court and the necessity for its orderly procedure require that such be the rule, and it is manifestly incompatible with the proper and efficient exercise by a judicial tribunal of its necessary functions that the fact of whether or not a contempt of such a nature as is here presented has been committed, be submitted to some other tribunal for determination. This court, in the case of *State ex rel. Nicomen Boom Co. v. North Shore Boom & Driving Co.*, 67 Wash. 317, 121 Pac. 467, Ann. Cas. 1913D 456, held that, in such a contempt proceeding as was then before the court, the trial should be summary by the court without a jury. The court quotes from Cooley's Constitutional Limitations (6th ed.), p. 389, note 2, as follows:

" 'Cases of contempt of court were never triable by jury, and the object of the power would be defeated in many cases if they were.'

"We conclude, therefore, that article I, § 22, of the state constitution, relied upon by appellant, providing for trial by jury 'in all criminal prosecutions,' does not apply to such a proceeding as this, which is only quasi or incidentally criminal in its nature, and that the statutes of this state cited by appellant in support of his contention are not applicable."

The power to punish for contempt of court being essential to the efficient action of the court and the proper administration of justice, it is lodged permanently with that department of government, and the legislature may not, by its enactments, deprive the court of that power or curtail its exercise. The attempt to divide such authority by a provision for the intervention of a jury is a substantial abridgment of the inherent powers of the court and constitutes an encroachment by the legislature upon the judicial department. These propositions are well settled and accepted by the great weight of authority. In the following cases will be found collected the many decisions

on the subject: *Walton Lunch Co. v. Kearney,* 236 Mass. 310, 128 N. E. 429; *Carter v. Commonwealth,* 96 Va. 791, 32 S. E. 780, 45 L. R. A. 310; *Pacific Live Stock Co. v. Ellison Ranching Co.,* 46 Nev. 351, 213 Pac. 700; *Hale v. State,* 55 Ohio St. 210, 45 N. E. 199, 60 Am. St. 691, 36 L. R. A. 254. The reasons for, and the extent of, the rule are thus summed up in the *Carter* case, *supra:*

"That in the courts created by the Constitution, there is an inherent power of self-defence and self-preservation; that this power may be regulated but cannot be destroyed, or so far diminished as to be rendered ineffectual by legislative enactment; that it is a power necessarily resident in and to be exercised by the court itself, and that the vice of an act which seeks to deprive the court of this inherent power is not cured by providing for its exercise by a jury; that while the Legislature has the power to regulate the jurisdiction of circuit, county, and corporation courts, it cannot destroy, while it may confine within reasonable bounds, the authority necessary to the exercise of the jurisdiction conferred."

We are aware that the rule of immunity from legislative control does not apply to such courts as are not created by the constitution, as, for instance, the inferior Federal courts. Such courts are not beyond the authority of the legislative body which created them. The distinction between the application of the general rule and that of the exception is clearly drawn in *Michaelson v. United States ex rel. Chicago St. P. M. & O. R. Co.,* 266 U. S. 42, 45 S. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451, wherein it is said:

"That the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice. The courts of the United States, when called into existence and vested with jurisdiction over any subject, at once become possessed of the power. So far as the inferior federal

courts are concerned, however, it is not beyond the authority of Congress (*Ex parte Robinson,* 19 Wall. 505, 510-511; *Bessette v. W. B. Conkey Co.,* 194 U. S. 324, 326); but the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative.''

The exception does not apply to our state superior courts, because they are created by the constitution and are beyond the authority of the legislature to abridge or curtail their power.

It follows from what we have said that the citation for contempt was not void.

The judgment is affirmed.

MAIN, MITCHELL, and GERAGHTY, JJ., concur.

TOLMAN, J. (concurring) — The controversy out of which this litigation arises has already cost at least one human life in this state *(State v. Hiatt,* 187 Wash. 226, 60 P. (2d) 71) and I approach the subject with a deep feeling of the responsibility resting upon this court to lay down a true, just and workable rule which will insure peace and safety so far as is possible within the law.

I accept the facts as stated, the analysis of the statute as given, and concur in much of what is said by the majority. My chief reason for concurring specially is to supply in some part, if I may, what has not been said.

The majority says that the precise question is "whether the legislature can abolish or abridge the power of the superior court to issue injunctions" and holds that it may not because "to do so would be an encroachment upon the judicial power." In my opinion, the legislature may take away from the courts, as now established, the power to protect certain rights and to exercise certain remedies, provided that it supplies a reasonably adequate remedy in the place of the

one abolished, but by the same token the legislature may not abolish a common law right and its remedy without setting up some reasonable substitute. To attempt to do so is to deny due process of law within the meaning of both the state and Federal constitutions. *Crane v. Hahlo,* 258 U. S. 142, 42 S. Ct. 214; *Truax v. Corrigan,* 257 U. S. 312, 42 S. Ct. 124, 27 A. L. R. 375; *New York Central R. Co. v. White,* 243 U. S. 188, 37 S. Ct. 247, Ann. Cas. 1917D, 629, L. R. A. 1917D, 1; *Hanfgarn v. Mark,* 289 N. Y. S. 143; *In re Opinion of Justices,* 211 Mass. 618, 98 N. E. 337.

This state is committed to that doctrine. The question, while not very clearly set forth, was necessarily decided in *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466, and *State v. Mountain Timber Co.,* 75 Wash. 581, 135 Pac. 645, L. R. A. 1917D, 10. The rule was clearly stated and followed by this court in the case of *Casco Co. v. Thurston County,* 163 Wash. 666, 2 P. (2d) 677, 77 A. L. R. 622. Because of the space already given to this case, I shall not cite further authorities. It is sufficient to say that whether this be the majority rule or not, clearly it is the reasonable rule and the one we have adopted.

As applied to the facts and conditions here involved and the general conditions now prevailing to an alarming extent in this state and throughout the nation, the opposite rule, which upholds legislation abolishing or abridging the power of the courts to enjoin wrongful acts which will produce loss and damage, would, if applied, invite anarchy and civil war.

Every known dispute which our complex civilization has produced is triable before some tribunal whose final judgment is conclusive, except only disputes between nations and disputes between employers and employees and like questions involving the employ-

ment of labor. This is not the place nor is it my duty to discuss the question of disputes between nations, but I conceive it to be my duty, as a judge of this court, under Rem. Rev. Stat., § 11042 [P. C. § 8673], to call to the attention of the governor, the legislature and the public at large, the lack of statutory means for enforcing a just, prompt and final decision of all such disputes as the one here involved.

Courts of equity have no doubt sometimes unwisely and unjustly used their power to enjoin, but, in the absence of the power to enjoin, we have only unlimited, unrestrained and uncontrolled war between employers and employees, whenever they differ, to the great loss and damage of all parties to the particular controversy and, perhaps, even greater loss and damage to the general public. Even by the exercise of the power to enjoin, as heretofore enjoyed by the courts, they cannot decide the controversy, and, injunction or no injunction, the fight goes on until force, necessity, or public opinion compels a settlement or a surrender. Without the power to enjoin wrongful acts, the war will be more cruel, more relentless, and more harmful to all concerned.

This situation is known to every one, and therefore the courts take judicial knowledge of it. Shall this condition continue unabated with no attempt on the part of any one to bring about a change?

I am well aware that neither capital nor labor seeks to have a tribunal created to decide such disputes; that for fear of political consequences no political party and no politician takes a stand upon this question, and that he who raises the question invites the enmity of those who will remember and visit their wrath upon him. Notwithstanding all this, and to the end that public sentiment may be aroused, I take this opportunity to appeal to the governor to recommend and to

the legislature to enact a law establishing a tribunal to which all such disputes must be promptly submitted and whose decisions shall be final, except only as they may be reviewed by the courts for arbitrary or capricious action, or because the tribunal has proceeded upon a fundamentally wrong basis.

Such a tribunal, like the courts, must be officered by men who may err; but who, having a just cause, will fear to submit it to men chosen for their experience with, and knowledge of, the subject matter, their integrity, their fairness and their general high standing?

Because, in order to prevent anarchy and civil war, we must preserve the right to enjoin by the courts in all proper cases until we have something better, I concur in the results reached by the majority.

HOLCOMB, J., concurs with TOLMAN, J.

BLAKE, J. (dissenting)—The majority say:

"In our opinion, §§ 7, 8 and 9, of the labor disputes act (Rem. Rev. Stat. (Sup.), §§ 7612-7, 7612-8, 7612-9) constitute an encroachment upon judicial power, and are therefore unconstitutional."

If I apprehend the true significance of this pronouncement and the argument in support of it, a doctrine is laid down which seems to me to be subversive of the very fundamentals of a democratic or a republican form of government. Such a form of government is predicated upon "certain inalienable rights" of the people. This decision is predicated upon *certain inalienable* rights of courts. It seems to me that the court, in this pronouncement, has lost sight of the character of the remedy by injunction, and particularly of its historical development with respect to labor disputes.

I shall not enter into any general discussion with respect to the power of courts of equity to grant in-

junctive relief. The injunction is as old as equity itself—indeed older, for it finds its precedent in the Roman interdict. But it must be borne in mind that it is purely a remedy granted to the suitor by grace and not as of right. It must be further borne in mind that the use of the injunction in labor disputes is of distinctly modern origin. Before discussing its historical development with respect to such controversies, it may be well to recapitulate what seem to me to be the salient facts presented by the record in these cases.

Omitting the portions obviously predicated on the N. R. A. aspects of the bill, the restraining orders provide:

"The defendants . . . and each of them, are hereby restrained from doing any act whatsoever in attempting to coerce, induce or persuade the plaintiffs to join the defendant union, and that these defendants, and each of them, are enjoined and restrained from calling any strike against the plant of the . . . Brewing Company, at Spokane, Washington, or from boycotting the products of said corporation, or from interfering with its products in any manner, shape or form, or in attempting to induce its customers not to trade with it *because* the . . . Brewing Company refuses to compel its employees, and plaintiffs herein, to join the teamsters' union."

The appellant, Harry Dail, not a party to the action, was cited into court for contempt on a show cause order reciting that he had "wilfully and contemptuously disobeyed and violated the restraining order," and had "attempted by force and threats and coercion to induce the Spokane Brewing & Malting Company to violate said restraining order . . ."

A hearing was had on the show cause order, and appellant was adjudged guilty of contempt. The sum and substance of the evidence upon which conviction was

predicated was that defendant, knowing of the existence of the restraining order; threatened to call a strike (accompanied by a boycott) in the brewery plant.

Now, to summarize just what has happened, the appellant has been punished for contempt, in an action to which he was not a party, for merely threatening to effectuate demands of his union by means which Mr. Justice Holmes forty years ago asserted to be generally conceded to be lawful. In a dissenting opinion in *Vegelahn v. Guntner,* 167 Mass. 92, 44 N. E. 1077, 57 Am. St. 443, 35 L. R. A. 722, Justice Holmes said:

"If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that when combined they have the same liberty that combined capital has to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control. I can remember when many people thought that, apart from violence or breach of contract, strikes were wicked, as organized refusals to work. I suppose that intelligent economists and legislators have given up that notion today. I feel pretty confident that they equally will abandon the idea that an organized refusal by workmen of social intercourse with a man who shall enter their antagonist's employ is wrong, if it is dissociated from any threat of violence, and is made for the sole object of prevailing if possible in a contest with their employer about the rate of wages."

The pertinency of these remarks to the instant case is that, without regard to chapter 7, Laws of 1933, Ex. Ses., p. 10 (Rem. Rev. Stat. (Sup.), §§ 7612-1 to 7612-15 [P. C. §§ 3467-21 to 3467-35]), the injunctive order in this case was improvidently issued. For here there was no overt act—no threat of violence to person

or property. Of course, since no appeal was taken by the *defendants* from the restraining order, we are compelled to start with the assumption that the order was made on sufficient showing. But the situation is impressive in view of the argument made by the majority in defending the inherent powers of the court against encroachment by legislative action. For here one is being punished who never had an opportunity to challenge the validity of the restraining order on the ground that it was an arbitrary exercise of judicial discretion. That the restraining order is an arbitrary exercise of judicial power, seems to me not to be open to question. For it denies to workmen *all* means by which they can make effective their acknowledged rights to organize, to bargain collectively, and to strike.

Passing this, however, we come to the main question of the case: Is chapter 7, Laws of 1933, Ex. Ses., p. 10, unconstitutional because it is an encroachment upon an inherent power of the court? If that act undertook to deny the court the power to grant injunctive relief in all cases, I should hesitate to disagree with the thesis of the majority opinion. If the use of the injunction in labor disputes was of ancient origin, I should yet hesitate to disagree. But such is not the case.

The first recorded case of the granting of injunctive relief in a labor controversy is *Springhead Spinning Co. v. Riley*, L. R. 6 Eq. 549 (1868). The defendants, who were officers of a trades union, gave notice, by means of placards and advertisements, to workmen not to hire themselves to plaintiff, pending a dispute between the latter and the union. Holding that these acts tended to the destruction of property, the court granted an injunction, saying:

"The jurisdiction of this Court is to protect property, and it will interfere by injunction to stay

any proceedings, whether connected with crime or not, which go to the immediate, or tend to the ultimate, destruction of property, or to make it less valuable or comfortable for use or occupation.''

The doctrine did not, however, thrive in England. The decision was severely criticized in *Prudential Assurance Co. v. Knott,* 10 Ch. App. 142, where it was said:

"The authorities cited are, the case of *Fleming v. Newton* (1), which appears to me to be an authority exactly to the contrary; the case of *Routh v. Webster* (2), which was an authority for preventing the improper use of a man's name against his will; the case of *Clark v. Freeman* (3), where the injunction was refused, and where Lord Langdale said the Court would not interfere to prevent a libel; and the only other case mentioned, *Springhead Spinning Company v. Riley* (4), decided by the Vice-Chancellor himself, upon which of course the learned Judge must be taken to have expressed the same opinion as he expressed in the case of *Dixon v. Holden* (5) . . .

"I think that the Vice-Chancellor Malins, in that case of *Dixon v. Holden,* was, by his desire to do what was right, led to exaggerate the jurisdiction of this Court in a manner for which there was no authority in any reported case, and no foundation in principle."

The significance of the last quotation is that the *jurisdiction* of courts of equity to grant injunctive relief in such cases was challenged from the beginning. Even so, the *Springhead* case recognized the limitations on the jurisdiction of equity to grant injunctive relief, as stated by Lord Eldon in *Iveson v. Harris,* 7 Vesey, Jr. 251, 256:

"And I have no conception, that it is competent to this court to hold a man bound by an injunction, who is not a party in the cause for the purpose of the cause."

For in the *Springhead* case the injunction was directed to parties to the suit.

It remained for the courts of the United States to extend the jurisdiction to grant injunctive relief against the world. *United States v. Debs,* 64 Fed. 724. This was a quick development after the courts of this country seized upon the doctrine of the *Springhead* case in 1888. *Sherry v. Perkins,* 147 Mass. 212, 17 N. E. 307, 9 Am. St. 689. During the depression years of the early nineties, government by injunction became rampant. *Casey v. Cincinnati Typographical Union,* 45 Fed. 135, 12 L. R. A. 193; *Coeur d'Alene Consolidated & Mining Co. v. Miners' Union of Wardner,* 51 Fed. 260, 19 L. R. A. 382; *Toledo etc. R. Co. v. Pennsylvania Co.,* 54 Fed. 730, 19 L. R. A. 387. The strong arm of equity was extended to uphold the enforcement of criminal law. One court went so far as to enjoin employees of a railroad company

" . . . *from combining and conspiring to quit, with or without notice, the service of said receivers, with the object and intent of crippling the property in their custody, or embarrassing the operation of said railroad, and from so quitting the service of the said receivers, with or without notice, as to cripple the property, or to prevent or hinder the operation of said railroad.* . . . " *Farmers' Loan & Trust Co. v. Northern Pac. R. Co.,* 60 Fed. 803, 25 L. R. A. 414.

The doctrine thus enunciated immediately drew criticism from the London "Law Times" where it was described as showing:

"The tremendous powers of government and control over the lives and fortunes of American citizens which may be claimed and exercised. . . . It was really placing large masses of workmen engaged upon great industrial undertakings under a slavery *regime.*" 97 Law Times 384.

But the power asserted in the *Northern Pacific* case

was quickly repudiated. *Arthur v. Oakes,* 63 Fed. 310, 25 L. R. A. 414. In that case, Mr. Justice Harlan, sitting as a judge of the circuit court of appeals, said:

"It would be an invasion of one's natural liberty to compel him to work for or to remain in the personal service of another. One who is placed under such constraint is in a condition of involuntary servitude,— a condition which the supreme law of the land declares shall not exist within the United States, or in any place subject to their jurisdiction."

An examination of the cases hereinbefore cited will show that, at first, injunctive relief was granted only to protect some tangible or intangible property right of the complainant, and the decree was operative only against parties to the suit. In the later cases, the theory of protection to the public crept in as a basis for granting injunctive relief, and the decree became operative not only against parties to the suit, but against everyone who might have actual or constructive notice of it. The doctrine of constructive contempt followed as a matter of course.

While, in the decisions, jurisdiction to enjoin acts amounting to crimes has been disclaimed, nevertheless the effect of this extension of equity jurisdiction has been to enjoin criminal acts and to substitute the star chamber for trial by jury.

It is also to be noted that in none of the cases (not even in *Truax v. Corrigan,* 257 U. S. 312, 42 S. Ct. 124, 27 A. L. R. 375) is the right to grant injunctive relief predicated upon the inherent powers of equity courts. Even in that case the Chief Justice conceded, at least for the sake of argument, that "the legislature has full discretion to grant or withhold equitable relief in any class of cases." p. 335.

By this rather extended review of the early decisions, I have endeavored to show that there is no historical basis for holding that the court has inherent

power, invulnerable to legislative regulation, to grant injunctive relief in labor disputes. By analogy, I believe this lack of historical basis for such a holding is demonstrable beyond peradventure.

It will be recalled that the use of the injunction to stay legal proceedings is as ancient as equity itself. Upon the adoption of the codes in this country, many of the states either prohibited entirely or greatly limited the use of the injunction for such purposes. At the present time, injunctions to stay judicial proceedings are absolutely prohibited, unless necessary to prevent a multiplicity of suits, in the following states: Arizona (Revised Code 1928, § 4281); California (Code of Civil Procedure, § 526, Civil Code, § 3423); Montana (Revised Code 1921, § 9242); North Dakota (Compiled Laws 1913, § 7214); South Dakota (Revised Code 1919, § 2035). In the following states, the power is limited to courts in which the proceedings are taking place: Arkansas (Digest of the Statutes 1921, § 5788); Colorado (Compiled Laws 1921, § 5770); Kentucky (Code of Practice, § 285); Virginia (Code of 1924, § 6318). In the following states, the power is conditioned on the requirement of a bond from the petitioner to protect the defendant against delay: Florida (Compiled General Laws 1927, § 4968); New Jersey (Compiled Statutes 1910, pp. 434-435, §§ 1292-1294).

It is true that we do not find many cases where the validity of such statutes has been challenged—probably for the reason that the power of the legislature to circumscribe remedial rights is too well established to be open to question. The question has arisen, however, in four cases decided by the supreme court of California, in all of which the legislative power is upheld. *Spreckles v. Hawaiian Commercial & Sugar Co.,* 117 Cal. 377, 49 Pac. 353; *Wright v. Superior Court,*

139 Cal. 469, 73 Pac. 145; *Reclamation Dist. v. Superior Court,* 171 Cal. 672, 154 Pac. 845; *Anderson v. Neal Institutes Co.,* 37 Cal. App. 174, 173 Pac. 779. In the second of the above cited cases, the court had this to say:

"By section 3423, under the same title, it is declared that an injunction cannot be granted 'to stay a judicial proceeding pending at the commencement of the action in which the injunction is demanded, unless such restraint is necessary to prevent a multiplicity of such proceedings.' (Civ. Code, secs. 3366, 3423.) It is not pretended, nor could it well be, that the injunction in this case was to prevent a multiplicity of actions or proceedings; on the other hand, it added another action to the one already pending. And in the action then pending in the city and county of San Francisco the testimony sought to be had in the action or proceeding in the county of Santa Clara by the so-called bill of discovery could have been taken and used in the former action. Therefore, the action or proceeding now under consideration was not only unnecessary, but expressly prohibited by the Code. In *Spreckles v. Hawaiian etc. Co.,* 117 Cal. 377, these sections of the Code were fully considered, and it was there held that the provisions of the Civil Code upon the subject of specific and preventive relief are designed to cover the whole subject, and are not mere rules of procedure, but define and regulate rights, *and that the constitutional grant to the superior court of jurisdiction in all cases of equity was not intended as a limitation upon the power of the legislature to regulate the rights of persons; and the legislature may either create new rights under which new cases in equity may arise, without endangering the jurisdiction of the courts of equity, or may cause some rights to cease to exist so that certain cases which courts of equity once entertained can no longer arise, without diminishing the jurisdiction of the superior courts in all cases in equity.*

"The superior court of Santa Clara county was without jurisdiction to enjoin the action then pending in the city and county of San Francisco, or the parties

plaintiffs (respondents herein) from prosecuting said action.'' (Italics mine.)

And in the first case, it is said:

''Counsel for respondent, however, contend that, if this construction of the law be correct, *it is unconstitutional, because it deprives the court of jurisdiction conferred upon it by the constitution.* Upon this subject the constitution simply provides: 'The superior courts shall have original jurisdiction in all cases in equity.' Certainly it still has jurisdiction of all cases in equity notwithstanding these provisions of the Code. The trouble, then is, not that the court has not jurisdiction, for it has, but that the plaintiff under the present law cannot make a case which entitles him to relief. The right does not exist under the law. *Statutory changes are almost perpetual. New rights are created under which new equities arise. These make new cases in equity, of which the courts at once take cognizance. The jurisdiction of courts of equity is not thereby enlarged. Neither is it diminished when by statutory changes some rights cease to exist and certain cases which courts of equity once entertained can no longer arise.* The grant of power is not confined to cases in equity which could exist under the law as it stood when the constitution was adopted. It includes all cases in equity at all times. It was not intended as a limitation upon the power to legislate upon the rights of persons. These sections deal with the rights of persons, and do not regulate procedure.'' (Italics mine.)

While not dealing with the specific subject, the case of *United Railroads v. Superior Court,* 170 Cal. 755, 151 Pac. 129, Ann. Cas. 1916E, 199, is of much interest. Discussing statutes which prescribed the instances in which, and circumstances under which, injunctive relief could be granted, the court said:

''We are aware of the fact that by our constitution very many limitations have been imposed upon the legislative department, but we are satisfied that there is nothing therein that expressly or impliedly prevents

the legislature from enacting such regulations as to the exercise by the superior court of its 'original jurisdiction in all cases in equity' as those pertinent to the matter before us, to which we have already referred. . . . From what we have said as to our statutory provisions on the subject of *such* injunctions, it is manifestly our opinion that they unequivocally have the effect of precluding any such exercise of power on the part of the trial court.''

There is yet another field in which the legislatures of many states (including our own) have abrogated or limited the use of the injunction: to restrain the levy and collection of taxes. Our own act (Rem. Rev. Stat., § 11315-1 [P. C. § 6882-189]) provides:

''Injunctions and restraining orders shall not be issued or granted to restrain the collection of any tax or any part thereof, or the sale of any property for the non-payment of any tax or part thereof, except in the following cases:

''(1) Where the law under which the tax is imposed is void; and

''(2) Where the property upon which the tax is imposed is exempt from taxation.''

In the case of *Casco Co. v. Thurston County,* 163 Wash. 666, 2 P. (2d) 677, 77 A. L. R. 622, this act was challenged on the ground, among others, that it was an unconstitutional invasion of judicial power. The court summarily disposed of the contention in the following language:

''We can see here no encroachment upon the constitutional power of the courts, but simply and solely a legislative attempt to provide an adequate legal remedy where, if a legal remedy before existed, it was a doubtful or inadequate one, so that the courts, while retaining to the full all of the equitable powers inherent in them, will find only lessened occasions for the use of such powers.''

This statement is in harmony with the principles

laid down in the above quotations from the California cases.

Indeed, these principles are consonant with the more general rule, to which this court is also committed, that there is no vested right in a remedy. A remedial right may be abridged or abrogated, provided the legislation does not impair contract rights or deprive one of a vested property right. *Ettor v. Tacoma,* 57 Wash. 50, 106 Pac. 478, 107 Pac. 1061. (This case was reversed by the supreme court of the United States on the ground that the legislation under attack did deprive the plaintiff of a vested property right. The principle above stated, however, was approved and reiterated. *Ettor v. Tacoma,* 228 U. S. 148, 33 S. Ct. 428); *White v. Powers,* 89 Wash. 502, 154 Pac. 820; *Seattle v. Seibert,* 129 Wash. 346, 225 Pac. 67; 2 Cooley's Constitutional Limitations (8th ed.), 754. Even where the legislation affects existing contracts, a remedy may be abrogated, provided another adequate remedy is substituted. Such legislation is held not to impair the obligation of contracts. *Oshkosh Waterworks Co. v. Oshkosh,* 187 U. S. 437, 23 S. Ct. 234. But when the right is *purely remedial,* and does not affect existing contracts or vested property rights, it may be abrogated without the substitution of another remedy. *Ettor v. Tacoma, supra;* 1 Cooley's Constitutional Limitations (8th ed.), 587 *et seq.*

This distinction, however, is probably irrelevant, in view of our recent holding in *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, wherein we held that a *substantive* right may be abrogated without the substitution of another in its stead. In that case we said:

"It is a well-settled principle of law, followed by all courts, that the presumption is in favor of the constitutionality of a statute. 6 R. C. L. 97, § 98. As expressed in our decisions, the rule in this state is that

the court will not declare a law unconstitutional unless its invalidity is so apparent as to leave no reasonable doubt on the subject. *State v. Ide,* 35 Wash. 576, 77 Pac. 961, 67 L. R. A. 280, 102 Am. St. 914; *Litchman v. Shannon,* 90 Wash. 186, 155 Pac. 783; *Uhden, Inc. v. Greenough,* 181 Wash. 412, 43 P. (2d) 983. . . .

''Respondent had no vested right of action at the time that the act was passed. The effective date of the act was prior to the time of the accident. Assuming that at common law respondent would have had a right of action, the rule upon which such right was founded was changed by the legislature, which it had the right to do. A person has no vested interest in any rule of the common law. *Munn v. Illinois,* 94 U. S. 113, 134, 24 L. Ed. 77; *New York Central R. Co. v. White,* 243 U. S. 188, 198, 37 S. Ct. 247, 61 L. Ed. 667, Ann. Cas. 1917D, 629; *Silver v. Silver,* 280 U. S. 117, 50 S. Ct. 57, 74 L. Ed. 221, 65 A. L. R. 939; 3 Willoughby on Constitution of the United States (2d Ed.) 1820, § 1216; 6 R. C. L. 156, 157, § 156. There was no violation of the due process clause.''

If this be true with respect to a chose in action, a substantive property right recognized from time immemorial (2 Kent's Commentaries, 14 ed. 553), it must be equally true of a remedial right. Taking the holding in the *Shea* case and the holding in the instant case together, the court has in effect said to the legislature,

''You may abrogate substantive rights of the people without restriction, but remedial rights only in so far as you do not trench upon what we conceive to be our judicial prerogatives.''

In my opinion, the position is unsound in law and logic. Holding to that position, the court can give lip service only to the fundamental theory upon which the structure of our government is reared: that it is comprised of three *coordinate* branches.

I dissent.

Beals, J. (dissenting)—The majority hold that the facts of this case present the question

" . . . whether the legislature can abolish or abridge the power of the superior court to issue injunctions, or regulate that power in specific classes of disputes in such a way as will, to that extent, abolish or abridge the power,"

and holds that this the legislature cannot do, "because to do so would be an encroachment upon the judicial power." In my opinion, this holding is contrary to the weight of authority, including the opinion of this court in the case of *Casco Co. v. Thurston County,* 163 Wash. 666, 2 P. (2d) 677, referred to in Judge Blake's dissent. It is, of course, true that the superior court of this state is a constitutional court, and that jurisdiction or power vested in that court by the constitution cannot, by the legislature, be taken away in whole or in part.

Since very early times, the right of the British Parliament to take away substantive rights and prevent the courts from determining those rights upon any basis other than the statute has been recognized. The statute of frauds (29 Car. II, c 3) and several ancient statutes of limitation are conspicuous examples of the exercise of this prerogative. In this country, many states, including Washington, have added to the statute of frauds new sections bringing different classes of contracts within its scope. Substantive rights which may be in justice and equity well founded have by these laws been limited or destroyed by legislative fiat, and the courts thereby prevented from administering justice between man and man. Such limitations upon the powers of the courts to determine cases arising upon various forms of contract are based upon a sound legislative policy, and under the principle of the greatest good to the greatest number are whole-

some, if not necessary, restrictions upon the administration of absolute justice.

Other instances could be cited, but I shall refer only to the statute of this state (chapter 18, Laws 1933, p. 145 [Rem. Rev. Stat. (Sup.), § 6297-1]), upon which was based our recent decision in the case of *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615. By this statute, the right of one riding in an automobile as a guest to maintain an action for injuries received as the result of the negligence of the driver was absolutely taken away. True, the act did not state that the court should not have jurisdiction to entertain such a case—it merely abolished any such cause of action—but the effect, it seems to me, is exactly the same. One·presenting to the superior court his complaint, asking for damages based upon injuries received while riding in a car as a guest, suffers an adverse judgment because the legislature has said that, no matter how meritorious such a claim shall be (save as to the exceptions mentioned in the act), any application to the courts for relief shall be a vain and useless gesture. This goes farther than merely affecting the form of remedy for a wrong; it declares that a wrong shall henceforth be without remedy.

I do not understand that the majority opinion holds that the act here in question is bad because by its terms it states that the courts of this state shall not have jurisdiction to do certain things in a particular class of cases, but that it is void because it purports to take away some judicial jurisdiction derived from the constitution. For my part, I see no important distinction between a law which says that no court shall have jurisdiction to entertain an action for damages brought by a guest against his host and one which provides that no guest shall have a cause of action for damages in such a case. The effect is the same which-

ever form of words is used, and while technically the legislative intention is more clearly expressed by an act which abolishes the cause of action, I would be disinclined to hold an act bad simply because it reached the same result by the use of different words. I cannot follow the majority opinion in distinguishing between a legislative abolition of a cause of action and an act of the legislature which merely limits the power of the courts in certain cases. Certainly, the complete taking away of a right theretofore existing constitutes the exercise of a higher prerogative than the limiting of the relief to be granted in an action based upon alleged violation of a right which the legislature has still permitted to exist. The greater includes the lesser, and the power to destroy, generally speaking, should include the power to limit or reduce. Many states have laws limiting the amount of recovery in actions for wrongful death, and such statutes have been held valid.

Section 6, of art. IV, of the state constitution, quoted in part in the majority opinion, vests the superior court with original jurisdiction in law cases just as completely as in cases arising in equity, and still the exercise of this jurisdiction has been repeatedly limited by the legislature by the abolition of certain causes of action.

If it be argued that the constitutional jurisdiction of the superior court to hear and determine actions, if not destroyed in certain cases, cannot be limited by statute, it seems to me that the answer is that such jurisdiction has been limited by statutes prescribing certain rules of evidence, such as Rem. Rev. Stat., § 1211 [P. C. § 7722], which renders a party to an action incompetent to testify as to transactions with a person deceased, when the adverse party sues or defends as the representative of such person. The legislature has also prescribed the form of procedure

which a court shall follow, as we find in Rem. Rev. Stat., § 996 [P. C. § 7512], that in a divorce case "the court shall state the facts upon which the decree is rendered."

Section 1, chapter 62, Laws of 1931, p. 201 (Rem. Rev. Stat., § 11315-1 [P. C. § 6882-189]), which was considered by this court in the case of *Casco Co. v. Thurston County, supra,* which act is quoted by Judge Blake in his dissent, and which was by this court sitting *En Banc* held valid, certainly abridged the power of the superior court to issue injunctions in the specified class of cases. Manifestly, the legal remedy provided by the act to supplant the remedy theretofore open at equity places a heavy additional burden upon one whose property is illegally taxed but who does not come within the exceptions of the act. The equitable remedy by injunction was far more valuable than the legal remedy afforded by paying the unjust imposition and suing at law to recover judgment for the amount paid. By the act cited, the issuance of injunctions and restraining orders in certain cases was absolutely forbidden, no matter how outrageous the tax sought to be collected, or how difficult it might be for the owner of the property unjustly assessed to procure the money necessary to pay the tax. The legal remedy provided for by the act in many cases may afford no practical relief at all, but nevertheless the arm of the chancellor is paralyzed and unable to protect the property owner from possible irremediable damage. The opinion in the case cited is sound, but in my opinion the law there upheld certainly abridged the power of the superior court.

The majority opinion states objections to several sections of the act. Some of these sections are certainly subject to criticism, and possibly some should, for one reason or another, be held void. A telling

point is made against § 7 (e), it being stated that one who is faced with an irreparable injury is not required to await the pleasure of public officers nor to argue his case to a policeman. It is quite true that, if relief is needed, the courts should be open to one aggrieved, but at the same time no court of equity would enjoin persons from performing an act which the regularly constituted civil authorities were effectually preventing them from accomplishing. If the civil authorities are not functioning, the courts may, under the act, afford relief; if they are functioning, no judicial relief is needed.

This file is already long, and I shall not further add to it. For the reasons assigned, I am not in accord with the opinion of the majority.

MILLARD, C. J. (dissenting)—In *Casco Co. v. Thurston County,* 163 Wash. 666, 2 P. (2d) 677, was presented the question whether it was an encroachment upon the constitutional powers of the courts for the legislature to provide that injunctions shall not be issued except in certain cases to restrain the collection of any tax. We there held—what we there said can not lessen the force of that holding—that the procedure sought to be established did not constitute an unlawful encroachment upon the powers and functions of the judiciary as determined by the constitution. Clearly, the rule there announced is applicable in the case at bar, where the same question in principle confronts us. Until that case is overruled, I am bound thereby. There is no reason why the rule of *stare decisis* should not obtain in the case at bar as in any other case. It follows that I can not do otherwise than dissent.