# CARLSON *v.* STATE OF WASHINGTON, ON THE RELATION OF CURTISS.

## ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 307. Submitted March 17, 1914.—Decided May 25, 1914.

Although plaintiff in error, after setting up a Federal defense in the trial court, may not have based any exceptions upon the failure of that court to recognize it, if the appellate court did recognize, and by its decision necessarily overruled, that defense, this court must deal with the Federal question. *North Carolina R. R.* v. *Zachary,* 232 U. S. 248.

While, in ordinary cases, this court is bound by the findings of the state court of last resort, that court cannot, by omitting to pass upon basic questions of fact, deprive a litigant of the benefit of a Federal right properly asserted; and it is the duty of this court, in the absence of adequate findings, to examine the record in order to determine whether there is evidence which furnishes a basis for such a Federal right. *Southern Pacific Co.* v. *Schuyler,* 227 U. S. 601.

After reviewing the congressional and state legislation in regard to the construction of the Lake Washington Waterway, *held* that Congress has refrained from authorizing any work on behalf of the Federal Government with reference to lowering the level of Lake Washington, and that all responsibility in that respect was assumed by the State and county; and, notwithstanding the contract was made by

an officer of the United States Army, it was not on behalf of the United States, but as representing the State of Washington.

Under the acts of Congress relative to the Lake Washington Waterway, no agency of the Federal Government could have arisen prior to the action involved in this case with respect to anything done in connection with the construction of the canal.

Orders given by an officer of the United States in connection with work not authorized by any act of Congress will not justify one violating the injunction of a state court as doing the act under the direction of officers of the United States in charge of Government work.

The fact that title to right of way for a canal has vested in the United States and after completion the Secretary of War is to take charge of the canal, does not make the United States responsible, prior to completion, where Congress has expressly declared that the canal will only be accepted after completion, and that the local authorities shall meanwhile assume all responsibility in connection therewith.

66 Washington, 639, affirmed.

THE facts, which involve a review of the legislation, state and Federal, in regard to the construction of the Lake Washington Waterway to Puget Sound, and the extent of the responsibility of the Federal Government therefor, are stated in the opinion.

*Mr. Corwin S. Shank* for plaintiff in error.

There was no appearance or brief filed for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

Plaintiff in error was adjudged by the Superior Court of Thurston County, in the State of Washington, to be in contempt of that court, in that, with notice of a decree made by it restraining and enjoining any further excavation of the Lake Washington Canal, or any lowering of the waters of Lake Washington, he proceeded to blow out an embankment at the head of the canal, which until that

time held the waters of the lake at their natural level, so as to permit these waters to flow into the canal and thereby lower the level of the lake. The Supreme Court of the State affirmed the judgment (66 Washington, 639), and the case comes here under § 237, Jud. Code, upon the ground that the acts done by plaintiff in error, and because of which he was held to be in contempt of court, were done under the direction and authorization of officers of the War Department of the United States, acting in the performance of their duties in constructing a public improvement consisting of a ship canal extending from Lake Washington to Salmon Bay, in pursuance of statutes of the United States.

Our examination of the Federal question is somewhat embarrassed because the findings and statements of fact by the state courts contain no finding respecting some of the facts that are alleged as the basis of the present contention of plaintiff in error. The inadequacy is attributable, no doubt, to the mode in which the alleged Federal right was asserted. Plaintiff in error having been brought before the trial court upon an order to show cause, based upon a sworn complaint or information made by the relator setting forth circumstantially the blowing out of the embankment in question by one Erickson and by plaintiff in error as his foreman, the latter in his answer denied that he blew out the embankment upon the orders of Erickson, and on the contrary averred that he "did so by express orders of the engineering department of the United States Government." There was testimony tending to support this averment, but the trial court, while making no specific finding upon the subject, in effect held that the work was done in behalf of the State of Washington, one of the parties to the cause in which the restraining decree was made. To its findings numerous exceptions were taken, but in none of these was any Federal right asserted, nor was any deficiency in the findings suggested. The Su-

preme Court, however, instead of disregarding the claim
of Federal right upon the ground that it had been aban-
doned in the trial court, recognized the contention of
plaintiff in error that the "work was done under the direc-
tion of the United States engineers who had charge of the
work for the Government," and by its decision necessarily
overruled it. We must, therefore, deal with the Federal
question. *North Carolina R. Co.* v. *Zachary*, 232 U. S.
248, 257.

Among the assignments of error is one based upon the
refusal of the Supreme Court to find as a fact that the
acts for the performance of which plaintiff in error was
held guilty of contempt were done under the direction
and authorization of officials of the War Department of
the United States, acting in pursuance of and in accord-
ance with the acts of Congress. While, in ordinary cases,
we are bound by the findings of the state court of last
resort respecting matters of fact, it is hardly necessary
to say that that court cannot, by omitting to pass upon
the basic questions of fact, deprive a litigant of the benefit
of a Federal right, any more than it could do so by making
findings that were wholly without support in the evidence.
And just as this court, where its appellate jurisdiction is
properly invoked and all the evidence is brought before
it, will, if necessary for a decision of a Federal question,
examine the entire record in order to determine whether
there is evidence to support the findings of the state court,
so it is our duty, in the absence of adequate findings, to
examine the evidence in order to determine what facts
might reasonably be found therefrom and which would
furnish a basis for the asserted Federal right. *Southern
Pacific Co.* v. *Schuyler*, 227 U. S. 601, 611, and cases cited.

Since the present record appears to contain all the evi-
dence that was submitted to the state courts, we proceed
to supplement the statement made by the Supreme Court
by adding such further facts pertaining to the asserted

claim of Federal right as might reasonably have been found, with the following result:

One Erickson, a general contractor, had entered into a contract for excavating a part of the Lake Washington Canal. The contract was in writing, dated August 16, 1910, and was made between "Arthur Williams, Captain Corps Engineers, United States Army, hereinafter represented as the contracting officer representing the State of Washington, on the one part, and C. J. Erickson, of Seattle, in the County of King, State of Washington, hereinafter designated as the contractor, of the second part." The work covered by the contract was nearing completion when, on October 22, 1910, in an action pending in the Superior Court in and for the County of Thurston, between William L. Bilger and others, plaintiffs, and the State of Washington, King County, and Erickson, defendants, upon the application of the plaintiffs for an order enjoining defendants from removing the embankment between the excavated portion of the canal and Lake Washington, the court, being satisfied that such removal might tend to lower the waters of the lake to the detriment and damage of the plaintiffs, announced that a restraining order would issue. In accordance with this announcement a formal decree was made under date October 28. Erickson had notice of the announced decree, and plaintiff in error, who was acting as his foreman upon the work, had written notice of it on October 26, after which he proceeded to blow up the embankment, contrary to the prohibition. Under the state practice, the decree bound them from the time they were informed of it, although it was not yet formally entered. There was evidence tending to show that plaintiff in error acted under orders coming not from Erickson, but from Captain Williams; and his own testimony was to this effect. Other evidence tended to show that the canal strip or right of way was in the control of the War Department, with a watchman actually upon

the ground. The contract was not introduced in evidence, and there was only meagre testimony as to its contents, which left it doubtful whether the final work of excavating the opening between the head of the canal and the lake was within its provisions. Since there is no distinct finding upon this subject, we will consider the case in both aspects.

The act of Congress especially invoked as authority for what was done by plaintiff in error under direction of Captain Williams, is the River and Harbor Act of June 25, 1910 (36 Stat. 630, 666, c. 382), which contains the following:

"Puget Sound—Lake Washington waterway: Continuing improvement by the construction of a double lock, with the necessary accessory works, to be located at 'The Narrows,' at the entrance to Salmon Bay, in accordance with the project set forth in House Document Numbered Nine hundred and fifty-three, Sixtieth Congress, first session, one hundred and fifty thousand dollars; and the Secretary of War may enter into a contract or contracts for such material and work as may be necessary to complete said lock and accessory works, to be paid for as funds may be provided from time to time by law, not to exceed in the aggregate two million two hundred and seventy-five thousand dollars, including the amount herein appropriated: *Provided*, That before beginning said work, or making such contract or contracts, the Secretary of War shall be satisfied that King County, or some other local agency, will do the excavation in the waterway above the lock to the dimensions recommended in said project, and will also secure the United States from liability for any claims or damages on account of the grant made to James A. Moore or his assigns by the Act of Congress approved June eleventh, nineteen hundred and six, or on account of the lowering of the level of Lake Washington, raising the level of Salmon Bay, or any other alteration of the level of any part of said waterway."

In order to correctly appreciate the meaning and effect, of this language, it is necessary to refer to House Document No. 953, 60th Cong., 1st Sess. (Vol. 20), and to certain previous acts of Congress therein mentioned; and while reviewing these acts we may at the same time consider whether any of them contains any justification of what was done by plaintiff in error.

By way of preface, it should be stated that the city of Seattle lies between the tidal waters of Puget Sound and Lake Washington, the latter being a body of fresh water two miles or more in width and nineteen miles or more in length, and having a natural level 30 feet or more above mean low water in the Sound. Between this lake and the Sound is Lake Union, a smaller body of fresh water (covering about 1,000 acres), and having a natural level much lower than that of Lake Washington, yet considerably above the tide. The lakes had independent natural outlets. Salmon Bay is a small body of water connected through Shilshole Bay with Puget Sound, and is (or was) affected by the ebb and flow of the tide. The outlet of Salmon Bay is known as "The Narrows." Salmon Bay and Lake Union are wholly within the exterior limits of Seattle, and the city has also a considerable frontage on Lake Washington. This lake, as well as the city, lies within the limits of King County.

As early as the year 1890, September 19, 1890, 26 Stat. 426, 452, c. 907, Congress authorized a survey and estimate to be made for a ship-canal to connect the waters of these lakes with Puget Sound. A survey and report were made accordingly, but nothing resulted until 1894, August 18, 1894, 28 Stat. 338, 360, c. 299, when Congress appropriated $25,000 for dredging Salmon Bay, and the improvement of the waterway connecting its waters with the lakes, but with a proviso that no part of the money should be expended upon the improvement of the connecting waterway until the entire right of way and a release

from all liability to adjacent property owners had been secured to the United States free of cost and to the satisfaction of the Secretary of War. By act of March 2, 1895, 28 Stat. 910, 948, c. 189, $5,000 of this amount was authorized to be expended in making a definite survey and location of the improvement and in preparing a cadastral map showing each property required to be deeded to the United States or from which a release was required. The act of June 3, 1896, 29 Stat. 202, 234, c. 314, appropriated $150,000, again with the proviso that no part of it should be expended on the improvement of the waterway connecting the Sound with the lakes until the entire right of way and a release from all liability to adjacent property owners had been secured to the United States; and with the further declaration that the canal might be constructed either by the Smith's Cove route or by the Shilshole Bay route, in the discretion of the Secretary of War.

In 1898 a Board of Engineer Officers was appointed to determine the choice, and recommended the Shilshole Bay route, with a lock at the Narrows near the foot of Salmon Bay. This recommendation was approved by the Secretary of War April 14, 1899, and right of way proceedings were completed and deeds obtained and accepted by the Secretary of War in 1900.

The legislature of Washington, by act approved February 8, 1901, Sess. Laws, p. 7, granted to the United States the right to construct and operate the ship canal upon any lands belonging to and waters of the State in King County, within limits to be defined by the plans and specifications for the improvement as approved by the Secretary of War, with the right to raise the waters of Salmon Bay and to lower the waters of Lake Washington in the prosecution of the improvement.

Congress was still unwilling to sanction any particular project for the canal, and by act of June 13, 1902, 32 Stat. 331, 347, c. 1079, while an appropriation of $160,000 was

made under the usual designation for "Improving water-
way connecting Puget Sound with Lakes Union and Wash-
ington," it was provided that this sum, together with the
unexpended balance to the credit of the improvement,
should be expended in dredging a low-water channel 10
feet in depth from Shilshole Bay through Salmon Bay to
the wharves at Ballard (at the head of the Bay); with a
further proviso that a board of engineers should be ap-
pointed by the Secretary of War to make surveys, exam-
inations, and investigations to determine the feasibility
and advisability of constructing a canal with necessary
locks and dams, connecting Puget Sound with the lakes,
of sufficient width and depth to accommodate the largest
commercial and naval vessels, to examine the route for a
similar canal connecting Elliott Bay with the lakes, and to
report upon the relative advantages of all proposed routes;
and it was declared that "Nothing herein shall be con-
strued as the adoption of any project for the construction
of a waterway connecting Puget Sound with Lakes Union
and Washington." The Board reported, January 6, 1903,
that a canal sufficient to accommodate the largest com-
mercial and naval vessels was feasible, but not advisable,
chiefly because of the great cost, estimated at over
$8,000,000.

The act of March 3, 1905, 33 Stat. 1117, 1144, c. 1482,
made a further appropriation of $125,000, limited to dredg-
ing the channel to Ballard.

Meanwhile, it appears, the people of Seattle had become
discouraged about the prospect of obtaining Government
aid, and therefore accepted the proposition of one James
A. Moore to build upon the Government right of way a
canal with a suitable timber lock, if the County of King
would contribute $500,000 toward it; and an act of Con-
gress of June 11, 1906, 34 Stat. 231, c. 3072, was secured,
authorizing him to proceed with this work, subject to such
conditions and stipulations as should be imposed by the

Chief of Engineers and the Secretary of War for the protection of navigation and the property and other interests of the United States, to include provision for the discharge of waters from Lakes Union and Washington, and afford adequate protection against claims for damages for changing the level of Lake Washington, and subject to provisos which required that plans and specifications should be approved by the Secretary of War, that Moore and his assigns should be liable for any damage occasioned by the construction of the lock and canal by overflow, by a lowering of the waters affected, or otherwise, and that the canal and lock when completed should be turned over to the United States ready for use and free of all expense.

The Moore plan included a timber lock between the lakes, and seems to have contemplated another lock to be constructed by the Government at the mouth of Salmon Bay. Shortly after the passage of the act just mentioned King County pledged its credit to the extent of $500,000 in aid of the Moore project. A little later, however, the local interests inaugurated a movement for the installation of a permanent masonry lock in place of the timber lock, and legislative authorization was procured (act of March 18, 1907, Sess. Laws, p. 582), for the establishment of an assessment district in order to impose upon the shore lands benefited a part of the cost of the improvement. The same legislature supplemented the act of 1901 by a specific grant of a right of way over state lands between the lakes (act of March 16, 1907, Sess. Laws, p. 498).

About the same time Congress was again appealed to, and by act of March 2, 1907, 34 Stat. 1073, 1108, c. 2509, the Secretary of War was authorized to "make a survey and estimate of cost of said waterway or canal with one lock, with a view to the construction of the same, in conjunction with the county authorities of King County or other agency, of sufficient size to accommodate the largest commercial or naval vessels afloat; or, if deemed more

advisable, with a view to the construction of a canal of less dimensions, and to submit dimensions and estimate of cost of same, together with a report upon what portion of said work will·be done or contribution to be made by said county or other agency." And the provisions of the act of June 11, 1906, were thereby so modified as to permit Moore or his assigns to excavate a channel from deep water in Puget Sound at the mouth of Salmon Bay to deep water in Lake Washington, in lieu of constructing the canal and timber lock specified in that act. In June, 1907, Moore assigned his rights to a corporation created for the purpose of taking them over and coöperating with the assessment district in carrying out the work proposed to be done by local agencies; and it appears that some preliminary work was done upon the ground. By act of Congress of February 6, 1909 (35 Stat. 613, c. 83), the time allowed to Moore or his assigns for completion of the canal was extended until June 11, 1912.

In view of the history of the matter, the phrase "waterway or canal with one lock" in the act of 1907 evidently indicated a lock at The Narrows, and a continuous waterway thence to Lake Washington; and so it was construed. Pursuant to the authorization of Congress, an elaborate report of a survey and estimate of the cost of the proposed waterway was made by Major Chittenden, of the Engineer Corps, under date December 2, 1907, and submitted with the approval of the Division Engineer to the Chief of Engineers at Washington. It was reviewed by the Board of Engineers for Rivers and Harbors, and approved by them under date March 30, 1908, transmitted by the·Chief of Engineers, with his approval, to the Secretary of War, and by the Acting Secretary transmitted to Congress under date May 20, 1908. It is this report and the accompanying documents which constitute House Doc. No. 953, 60th Congress, ·1st Sess., Vol. 20, referred to in the act of. June 25, 1910, 36 Stat. 630, 666, c. 382, above quoted.

The project as thus submitted contemplated the construction of a double lock, to be located at The Narrows at the entrance to Salmon Bay, and an unbroken waterway through Salmon Bay and Lakes Union and Washington, the differences in level to be overcome by raising Salmon Bay and lowering Lake Washington approximately to the level of Lake Union. With reference to that part of the act of 1907 requiring report to be made as to what portion of the work would be done or contribution made by King County or other agency, the recommendation was that in lieu of a cash contribution the local interests should be asked to do a specific portion of the work. Major Chittenden proposed that the Government should build the lock, and that the local agency should excavate the canal. His recommendation to this effect was concurred in by the Division Engineer and by the Board of Engineers for Rivers and Harbors, and the Board further recommended—"That the undertaking of the project by the United States be made contingent upon the furnishing to the Secretary of War of satisfactory evidence—First. That King County or other local agency will do the excavation in the waterway above the lock to the dimensions recommended. Second. That the said King County or other local agency will hold the United States free from any claims or damages on account of the grant made to James A. Moore or his assigns on account of the act of June 11, 1906. Third. That the said King County or other local agency will hold the United States free against any claims or damages on account of lowering the level of Lake Washington, raising the level of Salmon Bay, or any other alteration of the level of any part of said waterway."

As will appear by reference to the act of 1910, these recommendations were approved and adopted by Congress as a part of the project, and the appropriation, as well as the authorization of the contract, was confined to the construction of a double lock at the Narrows. From the fore-

going review, it becomes evident that prior to this act all that was done by authority of Congress on the part of the Federal Government (aside from surveys and estimates and the acceptance of a conveyance of lands for the right of way of the canal), consisted of dredging work in Salmon Bay; and that the first construction work authorized in aid of the ship canal proper was that provided by the act of 1910, and was limited to the construction by the Government of a lock at the Narrows. It is further evident that at all times, and notably in the act of 1910, Congress has scrupulously refrained from authorizing anything to be done on the part of the Federal Government with reference to lowering the level of Lake Washington, raising the level of Salmon Bay, or otherwise altering the level of any part of the waterway, and that by the act of 1910 it was expressly provided that 'all responsibility for this should be assumed by King County or some other local agency.

Now, the *Bilger* suit, as appears by the decree therein already mentioned, was brought by parties who were owners of shore lands abutting upon Lake Washington, and riparian rights pertaining thereto, and the action was based upon the injury threatened to their property and rights by the material lowering of the water of that lake which was a necessary part of the public improvement. The defendants were the State, the County, and the contractor, and the object of the decree forbidding the further excavation of the canal was to prevent the lowering of the water to the detriment of plaintiff's property rights. There is nothing to show that the United States had acquired any rights as against these plaintiffs or other property owners of the same class, and any assumption by the War Department of responsibility for interfering with the natural level of the lake is inconsistent with the whole course of legislation to which reference has been made, and especially with the act of 1910. And this renders more

clear, what would probably be sufficiently plain from the language above quoted from the instrument, that the contract of August 16, 1910, between Captain Williams and Erickson was made not in behalf of the United States, but in behalf of the State of Washington. An engineer officer of the United States Army was probably selected to represent the State as a matter of convenience, in view of the fact that before acceptance of the finished work by the Government, the approval of the Secretary of War was a necessary prerequisite. But this did not in any wise enlarge the authority of Captain Williams with respect to the performance of the agreement. The act of Congress gave him no authority to act in behalf of the Federal Government with respect to the work of excavating the canal, or making a connection between it and Lake Washington which would necessarily lower the level of that lake. Hence it is a matter of no moment, for present purposes, whether the work for which plaintiff in error was held guilty of contempt of court, and which he claims was done under order of Captain Williams, was within or without the Erickson contract.

We are aware that the Supreme Court of the State of Washington, upon review of the decree in the *Bilger* suit, held that while the actual work of dredging the canal was done by the State and the County, it was done on behalf of the United States. It was for this reason, in part, that the decree awarding an injunction to restrain the further excavation of the canal was reversed. *Bilger v. State*, 63 Washington, 457, 467. So far as this view may have influenced the court in declaring the policy of the State, we have no concern with it. But we deem it clear that, under the acts of Congress, no agency for the Federal Government could arise with respect to anything done in the construction of the canal or the lowering of the level of Lake Washington. Neither the fact that the title to the right of way was vested in the United States, nor

the presumed purpose that the Secretary of War should take charge of the work when finished, can override the evident policy of Congress that the canal should be accepted only when completed and ready for use, free of cost to the United States, and that the local interests should do the work of excavation and assume sole responsibility for lowering the level of the water.

Since we are of the opinion that Captain Williams derived no authority from the acts of Congress, it follows that the immunity here asserted with respect to acts done under his command is without legal support. And this renders it unnecessary to consider whether plaintiff in error, being subject to the restraint of the decree of the state court in the *Bilger* suit as an agent of Erickson, one of the parties thereto, could, without modification of that decree, have successfully claimed immunity for a violation of the restraint upon the plea that he acted under the authority of the Federal Government. Upon this question, therefore, we express no opinion.

*Judgment affirmed.*