174 P.3d 11 (2007)
In the Matter of the DEPENDENCY OF A.K.
In the Matter of the Dependency of M.H.-O.
In the Matter of the Dependency of Y.H.
No. 78426-4.
Supreme Court of Washington, En Banc.
Argued February 13, 2007.
Decided December 20, 2007.
*13 Gregory Charles Link, Washington Appellate Project, Seattle, for Petitioners.
Sheila Malloy Huber, Stephen H. Hassett, Office of the Attorney General, Olympia, for Respondent.
Nancy Lynn Tainer, Sherri Wolson, ACLU of Washington Foundation, Seattle, for Amicus Curiae (ACLU).
Stephen Alan Smith, Kari Lee Vander Stoep, Kirkpatrick & Lockhart Preston Gates Ell, Seattle, Tammy Seltzer, Bazelon Center for Mental Health Law, Washington, DC, for Amicus Curiae (American Academy of Child and Adolescent Psychiatry).
Stephen Alan Smith, Kari Lee Vander Stoep, Kirkpatrick & Lockhart Preston Gates Ell, Seattle, Jennifer Mathis, Bazelon Center for Mental Health Law, Washington, DC, for Amicus Curiae (Bazelon Center for Mental Health Law).
Justin Dolan, Garvey Schubert Barer, Seattle, for Amicus Curiae (Children's Alliance).
Beth Ann Colgan, Casey Trupin, Columbia Legal Services/Institutions Project, Seattle, Patricia J. Arthur, National Center for Youth Law, Oakland, CA, Anne Aiping Lee, Brent M. Pattison, TeamChild, Kimberly Dawn Ambrose, University of Washington School of Law, Seattle, for Amicus Curiae (Columbia Legal Services).
Stephen Alan Smith, Kari Lee Vander Stoep, Kirkpatrick & Lockhart Preston Gates Ell, Seattle, for Amicus Curiae (Federation of Families for Children's Mental Health, Mental Health America, National Alliance on Mental Illness, and National Council for Community Behavioral Healthcare).
Patricia J. Arthur, National Center for Youth Law, Oakland, CA, for Amicus Curiae (National Center for Youth Law).
Nancy Lynn Sapiro, Seattle, for Amicus Curiae (Northwest Women's Law Center).
Beth Ann Colgan, Casey Trupin, Columbia Legal Services/Institutions Project, Seattle, for Amicus Curiae (TeamChild).
*14 ALEXANDER, C.J.
¶ 1 Petitioners M.H.-O. and Y.H. are teenage girls who ran away multiple times from foster homes in which they had been placed. The juvenile court found each of them in contempt of court for running away and used its "inherent contempt power" to order each of them to spend 30 to 60 days in detention. Petitioners ask this court to reverse the Court of Appeals decision affirming the juvenile court orders. They argue that the Court of Appeals erred in concluding that the juvenile court has the inherent power to impose punitive sanctions on a youth for indirect contempt. Although we disagree with petitioners' assertion, we conclude that the juvenile court improperly resorted to the use of its inherent power in this case. We, therefore, reverse the Court of Appeals.

I

A.Y.H.
¶ 2 In 2001, Y.H. was found by the Yakima County Juvenile Court to be a dependent child. Consequently, she was placed in foster care. Y.H. ran away from the foster home at least six times in 2003 and 2004. The first time she ran away, Yakima County Juvenile Court Commissioner Robert Inouye warned her that she needed to stay in the foster home in which she had been placed. After subsequent runs, Y.H. was found in contempt and sentenced to three to seven days in detention, with the option to purge her contempt by writing an essay and promising not to run away again. After her fourth disappearance, Y.H. was also moved to a new foster home. The fifth time Y.H. ran away, Commissioner Inouye warned her that if she ran again he might have to resort to the court's inherent contempt power in order to impose greater sanctions.
¶ 3 Finally, after the sixth time Y.H. ran away, respondent, Department of Social and Health Services (DSHS), asked the juvenile court to exercise its inherent contempt power and impose a punishment greater than the statutory remedy of up to seven days in juvenile detention with an option to gain earlier release by purging the contempt. Commissioner Inouye conducted a hearing on DSHS's request and heard testimony from witnesses. He subsequently sentenced Y.H. to 30 days in detention for contempt, without the opportunity to purge the contempt. He found:
If we continue to use [the] Becca procedure,[[1]] [Y.H.] will continue to make empty promises and continue to run and place her self at serious risk.
. . . .
[Y.H.]'s disobedience to the court orders has escalated in severity over time, rather than lessening in response to the Becca contempt sanctions.
[Y.H.]'s mother believes that the Becca sanctions are inadequate to change [Y.H.]'s behavior, and that something different should be tried, if another run is to be avoided.
There is reason to believe that an inherent contempt disposition will likely have coercive effect on [Y.H.]. It will become clear to [Y.H.] that continued future decisions to violate court orders may have much more serious consequences. It will give her a period of time to stabilize without the adverse influences which she seeks while one [sic] the run. It will not give her the opportunity to run again the next day after her contempt hearing (as she did on 8-30-03).
The stakes are high at this point[. Y.H.] appears headed for a very dangerous life style which includes gangs, drugs and sex to the exclusion of stability, safety and education. . . . We are risking a catastrophe with her future if we are unable to *15 formulate an adequate response to her bad choices.
Clerk's Papers (CP) (23252-2-III) at 73-74.
¶ 4 Y.H. moved for revision of the order. A judge of the Yakima County Superior Court upheld the commissioner's use of inherent contempt power to impose a 30-day sentence. Y.H. then appealed to the Court of Appeals.

B.M.H.-O.
¶ 5 Like Y.H., M.H.-O. was found by the Yakima County Juvenile Court to be a dependent child and placed in foster care. She also ran away from her placement at least six times in 2003 and 2004, two of these times within a day of promising the court she would not run again. After each of the first four of these disappearances, the juvenile court found M.H.-O. in contempt and sentenced her to four to seven days in detention, with the option to purge her contempt. Once, she was released after merely promising not to run again. After the third time M.H.-O. ran, Commissioner Inouye warned her that he might have to resort to the court's inherent contempt power to impose greater sanctions if she ran again.
¶ 6 The fifth time M.H.-O. ran away, DSHS moved for the juvenile court to exercise its inherent contempt power. Commissioner Inouye set a trial date, advised the parties that the contempt must be proved beyond a reasonable doubt, and warned M.H.-O. that detention imposed under inherent contempt power could last until she turned 18 and carried no option to purge the contempt. M.H.-O. stipulated "that she had run as alleged," in exchange for a recommended sentence of 30 days. CP (23211-5-III) at 86. Sentencing M.H.-O. to 30 days, with no option to purge the contempt, Commissioner Inouye found:
[M.H.-O.] has repeatedly promised not to run, and repeatedly broken those promises. Given this recent history, a new purge promise not to run could not be believed.
There is reason to believe that an inherent contempt consequence with no purge option could achieve what a purgeable 7 days of civil contempt consequence could not. It will afford [M.H.-O.] a longer period of time to stabilize under the influence of a "home" where she is not on the streets and on the run. It will give her an opportunity to reflect and become more accustomed to a lifestyle which includes school and continuity.
Id. at 87.
¶ 7 A week after M.H.-O. was released from detention, she ran away again. DSHS again moved for the court to use its inherent contempt power to impose an appropriate sanction upon M.H.-O. After being advised of the "potential consequences" of the contempt motion "and of her rights," M.H.-O. again stipulated that she had violated a court order by running away. Id. at 76. In determining a proper sanction for M.H.-O.'s sixth contempt, Commissioner Inouye stated:
This court has attempted to persuade [M.H.-O.], through use of the usual civil contempt remedies, to begin following court orders and live in a safe manner. These efforts have failed, repeatedly.
. . . .
[M.H.-O.] has repeatedly demonstrated that this limited consequence does not deter her from choosing to run. . . .
. . . .
Hopefully [M.H.-O.] will grow out of this phase, before she suffers further serious or irreparable harm. Eventually a civil contempt sanction may have some actual coercive effect for her. . . .
At present, the court is unable to assure the basic safety of [M.H.-O.] without resort to the inherent contempt powers[.] The legislatively provided tools have proven inadequate.
Id. at 78. Commissioner Inouye went on to explain that there was "a reasonable basis for believing that some other specific period of detention will achieve what seven days will not," because M.H.-O. was "asking for help with in-patient drug treatment," and he believed that "[a] more extended period of time under the auspices of juvenile detention would give a more significant opportunity for her to experience being drug free in a more structured environment including an education *16 component." Id. at 79. Commissioner Inouye decided to give M.H.-O. a "more extended sentence" than he had prior to that time, because "that prospect is likely to have a greater deterrent effect." Id. Accordingly, he sentenced M.H.-O. to 60 days in detention, with no purge option.
¶ 8 M.H.-O. moved for revision of both orders. A judge of the Yakima County Superior Court upheld the commissioner's use of inherent contempt power to impose both the 30-day and 60-day sentences. M.H.-O. appealed to the Court of Appeals.

C. Court of Appeals Decision
¶ 9 The Court of Appeals essentially consolidated Y.H.'s and M.H.-O.'s appeals, along with a similar appeal by a third juvenile, A.K.[2] That court concluded that the juvenile court possesses the inherent power to impose a punitive sanction, such as the determinate sentences in this case, for indirect contempt of court. In re Dependency of A.K., 130 Wash.App. 862, 867, 125 P.3d 220 (2005). It ruled, however, that this power can be used only when the juvenile court finds (1) "that the statutory remedy is inadequate to meet the juvenile's needs" and (2) "that a different period of detention is necessary." Id. The Court of Appeals further determined that criminal due process protections must be afforded in a punitive contempt proceeding, including
notice of the charges, a reasonable opportunity to respond, the presumption of innocence, the right to have guilt proved beyond a reasonable doubt, the right to refuse to testify, the right to call witnesses and to cross-examine, the assistance of counsel, and the right to a trial before an unbiased judge.
Id. at 878, 125 P.3d 220 (citing Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 798-99, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987); In re Winship, 397 U.S. 358, 368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).
¶ 10 Applying these standards, the Court of Appeals concluded that the order relating to A.K. was deficient, because it failed to "specifically state the reasons why the juvenile court decided that the statutory civil remedial sanctions were inadequate" and why "a determinate sentence without the opportunity to purge would better address [her] contempt." Id. at 886, 125 P.3d 220. Accordingly, A.K.'s order was vacated.[3] The Court of Appeals also vacated one of the orders relating to M.H.-O., on the basis that she stipulated to facts without being informed of all her due process rights. The Court of Appeals affirmed the other two orders, which are now before us on review.

II

A. Mootness
¶ 11 This case is technically moot, petitioners having each served the sentence imposed for contempt. In re Det. of Swanson, 115 Wash.2d 21, 24, 793 P.2d 962, 804 P.2d 1 (1990). Consequently, effective relief cannot be afforded to either of them. Moreover, petitioners are now over the age of 18 and no longer subject to the jurisdiction of the juvenile court.
¶ 12 However, "[t]his court may decide a moot case if it involves matters of continuing and substantial public interest." Id. To determine "whether or not a sufficient public interest is involved," this court looks at three criteria: "`(1) the public or private nature of the question presented; (2) the desirability of an authoritative determination which will provide future guidance to public officers; and (3) the likelihood that the question will recur.'" Id. at 24-25, 793 P.2d 962, 804 P.2d 1 (quoting Dunner v. McLaughlin, 100 Wash.2d 832, 838, 676 P.2d 444 (1984)).
¶ 13 This consolidated case meets each of the three criteria. Although the due *17 process rights of juveniles are individual rights, the public has a great interest in the care of children and the workings of the foster care system. See, e.g., In re Interest of M.B., 101 Wash.App. 425, 433, 3 P.3d 780 (2000). The authority of the courts is similarly a public matter. In re Cross, 99 Wash.2d 373, 377, 662 P.2d 828 (1983). A determination of how the courts' inherent power interacts with the statutory contempt scheme will provide useful guidance to judges. Finally, the Court of Appeals noted in this case that the "exercise of inherent contempt authority to force compliance with placement orders is likely to recur," making "[c]larification of the court's authority to exercise inherent contempt power . . . a matter of continuing public interest." A.K., 130 Wash.App. at 870 n. 4, 125 P.3d 220. We agree. This case alone involved four such exercises of inherent contempt power in less than two months. The fact that we have been presented with a number of amicus curiae briefs speaks to the substantial public interest. Thus, we consider it appropriate to review this case.

B. Inherent Contempt Power of the Juvenile Court
¶ 14 "Contempt of court" is intentional:
(a) Disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to impair its authority, or to interrupt the due course of a trial or other judicial proceedings;
(b) Disobedience of any lawful judgment, decree, order, or process of the court;
(c) Refusal as a witness to appear, be sworn, or, without lawful authority, to answer a question; or
(d) Refusal, without lawful authority, to produce a record, document, or other object.
RCW 7.21.010(1). Contempt may be direct, occurring in the court's presence, or indirect, occurring outside of court. Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827 n. 2, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). A court's authority to impose sanctions for contempt is a question of law, which we review de novo. See M.B., 101 Wash.App. at 454, 3 P.3d 780.
¶ 15 Because contempt of court is disruptive of court proceedings and/or undermines the court's authority, courts are vested with "an inherent contempt authority, as a power `necessary to the exercise of all others.'" Bagwell, 512 U.S. at 831, 114 S.Ct. 2552 (quoting United States v. Hudson, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)) (citations omitted). Inherent contempt power is separate from statutorily granted contempt power. State v. Ralph Williams' N.W. Chrysler Plymouth, Inc., 87 Wash.2d 327, 335, 553 P.2d 442 (1976); Keller v. Keller, 52 Wash.2d 84, 86, 323 P.2d 231 (1958). It is "created by the constitution, . . . comes into being upon the very creation of . . . a court and remains with it as long as the court exists." Blanchard v. Golden Age Brewing Co., 188 Wash. 396, 423, 63 P.2d 397 (1936). The inherent contempt power "is lodged permanently with [the court], and the legislature may not, by its enactments, deprive the court of that power or curtail its exercise." Id. at 424, 63 P.2d 397; see also Mead Sch. Dist. No. 354 v. Mead Educ. Ass'n, 85 Wash.2d 278, 287, 534 P.2d 561 (1975); State v. Estill, 55 Wash.2d 576, 579, 349 P.2d 210 (1960). The legislature may only "regulate that power," and only "as long as it does not diminish it so as to render it ineffectual." Mead Sch. Dist., 85 Wash.2d at 287, 534 P.2d 561 (citing Carter v. Commonwealth, 96 Va. 791, 32 S.E. 780 (1899)). This inherent authority allows courts to impose sanctions upon the contemnor, after appropriate due process protections are provided.
¶ 16 Due process requirements vary depending on whether the contempt is direct or indirect and whether the sanctions imposed are remedial or punitive in nature. See Bagwell, 512 U.S. at 831, 114 S.Ct. 2552. A "remedial sanction" is one that is "imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform." RCW 7.21.010(3). It is considered civil, rather than criminal, in nature. Bagwell, 512 U.S. at 827, 114 S.Ct. 2552. A "punitive sanction," on the other hand, is "imposed to punish a *18 past contempt of court for the purpose of upholding the authority of the court," RCW 7.21.010(2), and it is considered criminal in nature, Bagwell, 512 U.S. at 828, 114 S.Ct. 2552. In determining whether sanctions are punitive or remedial, courts look not to the "stated purposes of a contempt sanction," but to whether it has a coercive effect  whether "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act." Id.
¶ 17 Due process requirements do not prevent the use of inherent contempt power; they merely limit its exercise. In delineating the process required when exercising this authority, the United States Supreme Court has differentiated between three types of use: (1) imposition of remedial sanctions for direct contempt, (2) imposition of remedial sanctions for indirect contempt, and (3) imposition of punitive sanctions for direct or indirect contempt. Id. at 832-33, 114 S.Ct. 2552. Different procedural protections are required for each of these three types of cases,[4] but due process does not prevent the court from exercising its inherent contempt power in any of those three ways. See id. Contrary to petitioners' claim, a court may use its inherent power to impose punitive sanctions for indirect contempt without violating the due process clauses of the United States Constitution.
¶ 18 In the present case, a juvenile court commissioner exercised this power. The juvenile court is a division of the superior court. State v. Werner, 129 Wash.2d 485, 492, 918 P.2d 916 (1996); RCW 13.04.021(1). As such, it possesses the inherent power granted to the superior court under our constitution. See Const. art. IV, §§ 5-6; see also State v. Martin, 36 Wash. App. 1, 4, 670 P.2d 1082 (1983), rev'd on other grounds, 102 Wash.2d 300, 684 P.2d 1290 (1984). Thus, the juvenile court, like other courts, possesses inherent power to sanction direct or indirect contempt by punitive or remedial sanctions. In Washington's court system, a juvenile court commissioner has "the power, authority, and jurisdiction, concurrent with a juvenile court judge, to hear all cases under this chapter and to enter judgment and make orders with the same power, force, and effect as any judge of the juvenile court." RCW 13.04.021(1); see also Const. art. IV, § 23. Consequently, the court commissioner issuing the inherent contempt orders in this case had the inherent power that is possessed by a superior court judge.

C. Limitations on the Exercise of Inherent Contempt Power
¶ 19 While inherent contempt authority is a critical component of judicial power, its use is only appropriate in limited situations. We have long held that courts may not exercise their inherent contempt power "[u]nless the legislatively prescribed procedures and remedies are specifically found inadequate." Mead Sch. Dist., 85 Wash.2d at 288, 534 P.2d 561 (citing State ex rel. Curtiss v. Erickson, 66 Wash. 639, 642, 120 P. 104 (1912), aff'd on other grounds by Carlson v. Washington, 234 U.S. 103, 34 S.Ct. 717, 58 L.Ed. 1237 (1914); State ex rel. Dye v. Rielly, 40 Wash. 217, 220, 82 P. 287 (1905)); see also State v. Boatman, 104 Wash.2d 44, 48, 700 P.2d 1152 (1985); State v. Browet, Inc., 103 Wash.2d 215, 218, 691 P.2d 571 (1984). "Only under the most egregious circumstances should the juvenile court exercise its contempt power to incarcerate a status offender in a secure facility. If such action is necessary, the record should demonstrate that all less restrictive alternatives have failed." State v. Norlund, 31 Wash.App. 725, 729, 644 P.2d 724, review denied, 98 Wash.2d 1013 (1982); see also In re Pers. Restraint of King, 110 Wash.2d 793, 802, 756 P.2d 1303 (1988).
¶ 20 In this case, the juvenile court commissioner did not specifically find that one of the statutory remedies available to him was *19 inadequate: criminal contempt of court, under RCW 7.21.040. Under that statute, a court may impose punitive sanctions of up to $5,000, up to one year imprisonment, or both on adult contemnors, after certain procedures are followed. RCW 7.21.040(5). Juvenile status offenders[5] can also be sanctioned criminally for contempt. State v. A.L.H., 116 Wash.App. 158, 162, 163-64, 64 P.3d 1262 (2003) (citing In re Interest of Rebecca K., 101 Wash.App. 309, 2 P.3d 501 (2000)). When juveniles are found guilty of a nonenumerated offense equivalent to an adult gross misdemeanor, such as contempt, see RCW 9A.20.010(2)(b), .021(2), the conviction is classified as a category D juvenile offense. RCW 13.40.0357. Category D offenses are punishable by confinement in a juvenile detention facility for up to 30 days, up to 12 months' community supervision, up to 150 hours' community restitution and/or a fine up to $500. Id. Under RCW 7.21.040(5), Commissioner Inouye could have sentenced petitioners to 30 days in juvenile detention, without a purge condition, after finding the remedial RCW 7.21.030(2)(e) sanction inadequate and affording proper criminal due process protections.
¶ 21 We recognize that the holding of Division Two of the Court of Appeals in A.L.H. may be inconsistent with our conclusion that criminal contempt sanctions may be imposed on juveniles violating a placement order in a dependency case. In A.L.H., the court held that only civil contempt sanctions may be imposed on a juvenile for violating an at-risk youth (ARY) order. The ARY statutes constitute a separate chapter of Title 13 RCW from the dependency statutes. As amended in 1998, the ARY contempt statute provided, "Failure by a party to comply with an order entered under this chapter is a civil contempt of court as provided in RCW 7.21.030(2)(e), subject to the limitations of subsection (3) [which limits sanctions to $100 and/or seven days' confinement] of this section." RCW 13.32A.250(2). The Court of Appeals interpreted this statute as "expressly limit[ing]" sanctions that may be sought for contempt to the remedial sanctions laid out in RCW 7.21.030(2)(e). A.L.H., 116 Wash.App. at 164, 64 P.3d 1262. "If contempt charges are brought against a juvenile in violation of an ARY order, the State must seek civil contempt remedies," the court concluded, but "any juvenile offender in contempt of court on some other basis may be subject to criminal, civil, or summary contempt under the general contempt statutes." Id. at 163-64, 64 P.3d 1262.
¶ 22 The wording of the dependency contempt statute  the statute at issue here  underwent the same 1998 amendments and is essentially identical to the ARY contempt statute: "Failure by a party to comply with an order entered under this chapter is civil contempt of court as provided in RCW 7.21.030(2)(e)." RCW 13.34.165(1). This subsection, like the ARY subsection, is followed by a subsection limiting "remedial sanction[s]" to seven days' confinement, RCW 13.34.165(2). Thus, when Commissioner Inouye made the orders at issue here, he specifically found that criminal contempt sanctions under RCW 7.21.040 were unavailable, basing that finding on the A.L.H. decision.
¶ 23 We disagree with Commissioner Inouye. First, we note that A.L.H. concerned a different statute than the one we are interpreting: the ARY contempt statute. Although the wording of the two statutes is similar, the purposes behind the statutes are somewhat different. The ARY statutes were designed to provide parents of at-risk youth with tools to assist them in raising their children and keeping their children safe. RCW 13.32A.010. The legislature specifically stated that services were to be offered "on a voluntary basis whenever possible . . . and that the courts [should] be used as a last resort." Id. The dependency statutes, on the other hand, were intended to protect the health and safety of children when "the rights of basic nurture, physical and mental *20 health, and safety of the child and the legal rights of the parents are in conflict." RCW 13.34.020. These statutes appear to contemplate greater court involvement, while the ARY statutes were partially aimed at providing interventions to keep children out of detention.
¶ 24 In addition, we do not find the A.L.H. decision entirely persuasive. Division Two of the Court of Appeals provided little to no reasoning for its decision limiting sanctions in particular cases to civil contempt remedies. In fact, the other Court of Appeals ARY cases cited in A.L.H.  M.B. and Rebecca K.  can be read as suggesting the opposite conclusion: that criminal sanctions can be imposed for violation of an ARY order, so long as the proper due process is afforded. Both of those cases addressed whether the legislature had, by declaring the RCW 7.21.030(2)(e) sanction to be "remedial," constitutionally transformed criminal sanctions into civil sanctions, allowing determinate sentences to be imposed without purge conditions and without criminal due process protections. See M.B., 101 Wash.App. 425, 3 P.3d 780; Rebecca K., 101 Wash.App. 309, 2 P.3d 501. Both opinions concluded that confinement in juvenile detention without a purge condition remained a punitive sanction requiring criminal due process, regardless of what the legislature called it. M.B., 101 Wash.App. at 445-46, 3 P.3d 780; Rebecca K., 101 Wash.App. at 316-17, 2 P.3d 501. Division Three of the Court of Appeals further stated in Rebecca K. that "[c]riminal contempt proceedings must be initiated by a criminal information filed by the State in order to comply with due process." Rebecca K., 101 Wash.App. at 317, 2 P.3d 501 (citing A.D.F. v. State, 88 Wash.App. 21, 26, 943 P.2d 689 (1997), superseded by statute on other grounds by State v. A.L.H., 116 Wash. App. 158, 64 P.3d 1262). Concluding that the sanctions in the Rebecca K. case were punitive in nature, the court reversed the orders of contempt, because the requirements of RCW 7.21.040 were not followed. Similarly, Division One "emphasize[d]" in M.B. that "due process prohibits a court from using either statutory or inherent power to justify its actions if the contempt sanctions are themselves punitive, unless the contemnor is afforded criminal due process protections." M.B., 101 Wash.App. at 453, 3 P.3d 780 (emphasis added). We infer from this language that Divisions One and Three of the Court of Appeals consider statutory criminal contempt sanctions to remain available in ARY cases after the 1998 amendments.
¶ 25 Finally, we interpret statutes so as to give effect to legislative intent. Campbell v. Dep't of Soc. & Health Servs., 150 Wash.2d 881, 894, 83 P.3d 999 (2004). The "chief objective" of the legislature's 1998 amendments to the contempt statutes "was to make detention available as a coercive tool for juvenile courts." M.B., 101 Wash.App. at 446, 3 P.3d 780; see also Laws of 1998, ch. 296, § 35 ("[i]t is the intent of the legislature to authorize a limited sanction of time in juvenile detention independent of chapter 7.21 RCW for failure to comply with court orders in . . . dependency cases for the sole purpose of providing the courts with the tools necessary to enforce orders in these limited types of cases because other statutory contempt remedies are inadequate"). The legislature did not expressly designate this new tool the exclusive remedy, instead noting that it "may be imposed in addition to, or as an alternative to, any other remedial sanction authorized by this chapter." RCW 7.21.030(2)(e). We have previously stated, "[b]ecause civil and criminal contempt sanctions employ different procedures and are applied for fundamentally different purposes, statutes providing for one kind of contempt cannot be read to circumscribe statutes providing for the other." King, 110 Wash.2d at 800, 756 P.2d 1303. We conclude that the legislature did not intend, by amending the dependency contempt statute, to abrogate the availability of criminal contempt sanctions under RCW 7.21.040 in dependency cases. Instead, as the legislature stated, it intended to merely create a new alternative sanction.
¶ 26 The dissent points out that the legislature, when creating the Becca sanctions, intended to discourage the filing of criminal charges against status offenders. Dissent at 24. Our holding in no way undermines this goal. We do not hold that criminal *21 sanctions should be sought before Becca sanctions and other civil statutory sanctions; we do not speak to the order in which statutory remedies should be utilized. Instead, we merely adhere to our previous jurisprudence requiring courts to utilize all the tools the legislature has seen fit to provide before exercising broader inherent powers. The legislature carefully crafted the new tool they intended to provide, limiting it to seven days in detention. We do not infer from this careful limitation an intent to allow courts to disregard other statutes and sentence juveniles to whatever time in detention they felt was reasonable.
¶ 27 Because we conclude that statutory criminal contempt sanctions are available for violation of a dependency order, it follows that a juvenile court must find those sanctions inadequate before exercising its inherent contempt power.[6] In the present case, Commissioner Inouye failed to do this. Consequently, his resort to inherent authority was premature and improper. Accordingly, we reverse the Court of Appeals' decision to the contrary. As a result, we need not consider petitioners' other claims for relief.

III
¶ 28 A juvenile court commissioner possesses the inherent power to impose punitive or remedial sanctions for contempt of court, whether that contempt occurs in or outside of the courtroom. However, before exercising that power, the court must specifically find all statutory contempt remedies inadequate. Because the commissioner did not do so in this case, we reverse the Court of Appeals' decision on the two inherent contempt orders before us and vacate those orders.
C. JOHNSON, SANDERS and J.M. JOHNSON, JJ., concur.
MADSEN, J. (concurring).
¶ 29 I agree with the majority that before a dependency court may exercise its inherent authority to hold a juvenile in contempt and impose a punitive sanction, it first must find that the statutory remedies for criminal contempt under RCW 7.21.040 are not adequate. However, to the extent that the majority may be read to require a dependency court to resort to criminal contempt before exercising its inherent authority to impose a coercive contempt sanction, I disagree. Criminal contempt and remedial contempt sanctions are aimed at different issues, and a judge who is concerned with coercing compliance with a court order will have no reason to consider the adequacy of criminal contempt sanctions.
¶ 30 Under RCW 13.34.165(2), a dependency court may impose up to seven days as a remedial sanction when a party fails to comply with an order entered under that chapter. However, a contempt sanction is only remedial if the contemnor is allowed an opportunity to purge the contempt and gain release. Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827 n. 2, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). Thus, as long as a dependency court employing the sanctions allowed under RCW 13.34.165(2) provides an opportunity for a juvenile to purge the contempt, the sanction is remedial. If a dependency judge concludes that seven days is an insufficient amount of time to coerce compliance, then the judge has the *22 inherent power to impose a longer detention period  as long as the juvenile has the power to end detention by complying at any time. As the Court of Appeals has observed in analogous circumstances: "On the rare occasion when a juvenile court decides it must disregard the statutory seven-day limit and resort to its inherent contempt powers, the court must enter a finding as to why the statutory remedy is inadequate and articulate a reasonable basis for believing why some other specific period of detention will achieve what seven days will not." In re Interest of M.B., 101 Wash.App. 425, 453, 3 P.3d 780 (2000).
¶ 31 In both of the cases before this court, the dependency courts imposed determinate, punitive sanctions without providing for a purge mechanism. Accordingly, the sanctions imposed were criminal, and the dependency courts in each case committed error by failing to provide due process protections, including initiation of charges by information, appointment of counsel, trial, and proof beyond a reasonable doubt. See Bagwell, 512 U.S. at 826, 114 S.Ct. 2552 ("`[C]riminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings.'" (quoting Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988))).
¶ 32 Perhaps of more concern, however, is the use of contempt proceedings in dealing with chronic runaways. As the Court of Appeals has observed,
[o]nly under the most egregious circumstances should the juvenile court exercise its contempt power to incarcerate a status offender in a secure facility. If such action is necessary, the record should demonstrate that all less restrictive alternatives have failed.
State v. Norlund, 31 Wash.App. 725, 729, 644 P.2d 724, review denied, 98 Wash.2d 1013 (1982).
¶ 33 A court should consider the mental health needs of the dependent child before resorting to a contempt sanction.[1] Many children in foster case suffer from mental health problems that lead to their runaway behavior. When considering whether less restrictive alternatives exist, the question is not merely whether a seven day purgeable sanction has proved ineffective, but whether needed mental health services or chemical dependency treatment have been provided.
¶ 34 As stated by amicus American Academy of Child and Adolescent Psychiatry, "The failure to address the underlying problems and stressors that lead to runaway behavior is compounded by punishing the young people, making it more likely that they will continue to run away from their foster care placements and encounter the very dangers from which the courts are obligated to protected them." Mem. of Amicus Curiae Am. Acad. of Child & Adolescent Psychiatry in Supp. of Pet'r's at 5.
¶ 35 Amicus calls this court's attention to numerous studies indicating that detention does not have an ameliorative effect on runaway behavior, and, in fact, often exacerbates the problem.[2] The record in this case bears this out: repeated detention of these children did not stop them from running away.
¶ 36 According to the records, after Y.H.'s placement in foster care she ran away several times. Three times Y.H. was sentenced to seven days in detention for contempt. After her fourth disappearance she was moved to a *23 different foster home, but no additional services were provided to assist in making her placement more successful or to address her running behavior. Instead, when Y.H. ran again the dependency court sentenced her to a 30 day period of detention. Similarly, M.H.-O. ran away from her placement at least six times. After the first four times, M.H.-O. was sentenced to seven days in detention. The fifth time she ran, the dependency court sentenced her to 30 days in detention. One week later, M.H.-O. ran again. Prior to her incarceration M.H.-O. made several requests for mental health services, but those services were not provided. Instead, after M.H.-O. ran again, the dependency court sentenced M.H.-O. to 60 days in detention. While in detention, her mental health worsened and she heard voices, rocked back and forth, and began cutting herself.
¶ 37 Detention should not be used as a substitute for access to basic services, treatment, and care. The repeated use of contempt proceedings is often ineffective and offers little opportunity to address the underlying problems that result in runaway behavior. In contempt proceedings, the focus is on deterring the child's misbehavior rather than ensuring the State is upholding its responsibility to provide an individualized response to the runaway behavior.
¶ 38 Another reason detention proves ineffective as a deterrent to runaway behavior is that children in foster care often run because of their desire to connect with family, friends, and familiar surroundings. Here, for instance, Y.H. repeatedly sought out her mother while on the run, while M.H.-O. ran to her father in Nebraska. Punishing these children with detention, where they must adjust to a new set of peers and authority figures in an unfamiliar environment, only increases their desire to run.
¶ 39 Children in foster care who suffer from mental health disorders present difficult challenges. However, incarceration in a locked detention facility punishes rather than rehabilitates these children. As amicus The Children's Alliance and Columbia Legal Services points out, there are alternatives to incarceration that are available by statute, including evaluation and treatment in secure facilities under RCW 70.96A.140 and .245 (chemical dependency involuntary treatment act) and RCW 71.34.600 (parent initiated mental health involuntary treatment act). Incarceration before fully exploring such alternatives is not a proper use of the court's inherent contempt powers, criminal or remedial.
BRIDGE, J., concurs.
OWENS, J. (dissenting).
¶ 40 The majority holds that a juvenile court must exhaust the remedies under the criminal contempt statute, RCW 7.21.040, before exercising its inherent contempt power. Under the criminal contempt statute, the State must file a criminal information to initiate the contempt proceeding. Under the civil contempt statute, RCW 7.21.030, the court may detain juveniles governed by the dependency statutes for up to seven days for civil contempt of court. RCW 7.21.030(2)(e). The majority's holding requires the State to initiate criminal contempt proceedings if the court determines that the statutory civil remedy is inadequate and a detention of more than seven days is needed to coerce the contemnor to comply with the court's orders. This result conflicts with long-standing jurisprudence confirming a court's authority to impose a coercive detention for indirect contempt within a civil proceeding and contravenes the legislature's intent to reduce the number of criminal charges against juveniles. I would hold that a juvenile court may exercise its inherent authority to order a coercive detention after finding the civil contempt statute inadequate without first exhausting the criminal statutory remedy. Thus, I respectfully dissent.
¶ 41 The majority's holding diminishes the court's inherent contempt power to enforce its orders and ignores long-standing precedent allowing a judge to impose coercive detention in a civil proceeding. The power of courts to punish contempt "is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." Gompers v. Buck's Stove & Range *24 Co., 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911); see also Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (holding that courts have independent power to impose submission to their orders) (citing Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 5 L.Ed. 242 (1821)); Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."). The United States Supreme Court has consistently held that a court can impose a conditional fixed term of detention in a civil proceeding to coerce a contemnor into complying with the court's orders. Bagwell, 512 U.S. at 828, 114 S.Ct. 2552; accord Shillitani, 384 U.S. at 368, 86 S.Ct. 1531 (upholding a two-year civil contempt sanction); Gompers, 221 U.S. at 442, 31 S.Ct. 492 (holding that imprisonment for civil contempt is intended to coerce the defendant "to do what he had refused to do"). Requiring a court to first turn to the criminal contempt statute before exercising its inherent power abdicates the court's inherent power to impose detention in civil contempt proceedings because the court will have to rely on the executive branch to enforce its orders, which it may refuse to do.
¶ 42 The majority's holding also disregards the legislature's intent to keep juveniles out of the criminal justice system. Under the majority's holding, a court wishing to impose eight days of confinement must seek a criminal charge. The legislature has consistently and repeatedly enacted statutes aimed at decriminalizing juvenile proceedings. State v. Schaaf, 109 Wash.2d 1, 15, 743 P.2d 240 (1987) ("For more than 70 years, this state has been trying to avoid accusing and convicting juveniles of crimes."). Contrary to the majority's assertions, majority at 20, the legislature has made clear that courts should impose detention without the filing of criminal charges: "[i]t is the intent of the legislature to avoid the bringing of criminal charges against youth who need the guidance of the court rather than its punishment." Laws of 1998, ch. 296, § 35 (emphasis added).
¶ 43 The noninclusion of the juvenile chapters in the criminal contempt statute further demonstrates the legislature's intent to decriminalize juvenile offenders. The majority concludes that courts should more readily impose criminal sanctions in dependency cases reasoning that, unlike at-risk-youth cases, dependency cases "contemplate greater court involvement." Majority at 20. The legislature makes no similar distinction. Failure to comply with an order entered under either the at-risk-youth statutes or the dependency statutes is civil contempt of court as defined in RCW 7.21.030(2)(e). See RCW 13.32A.250(2); RCW 13.34.165(1). The legislature amended RCW 7.21.030 in 1998 to provide a civil contempt remedy of commitment to juvenile detention for seven days in both at-risk-youth and dependency cases. See RCW 7.21.030(2)(e). The legislature did not likewise amend the criminal contempt statute to include youth governed by the at-risk-youth and dependency statutes. See RCW 7.21.040.
¶ 44 Any concerns that a court using this inherent power will hold juveniles in detention indefinitely is unfounded. A judge may not exercise inherent contempt power without limit. The exercise of inherent contempt power must comport with due process to protect against any arbitrary exercise of official power. Bagwell, 512 U.S. at 830-34, 114 S.Ct. 2552. In a civil contempt proceeding, the court must also afford the contemnor the opportunity for release from a fixed term of detention by satisfying a purge condition. See id. at 828, 114 S.Ct. 2552 (holding that a detention is coercive and civil where the contemnor is able to purge the contempt and thus "`carries the keys of his prison in his own pocket'") (internal quotation marks omitted) (quoting Gompers, 221 U.S. at 442, 31 S.Ct. 492); Shillitani, 384 U.S. at 370-71, 86 S.Ct. 1531 ("The conditional nature of the imprisonment . . . justifies holding civil contempt proceedings."); In re Pers. Restraint of King, 110 Wash.2d 793, 805, 756 P.2d 1303 (1988) ("The incarcerated contemnor must be afforded the opportunity to purge himself of the contempt."). In the instant case, the judge erred to the extent he did not include a purge option for Y.H. In the case of Y.H., the judge ordered 30 days of detention without *25 an option to purge. Clerk's Papers (CP) (23252-2-III) at 73-74. In the case of M.H.-O., the judge ordered 60 days of detention but scheduled a hearing 20 days later to review M.H.-O.'s participation and progress in services. If M.H.-O. progressed to the court's satisfaction, she would earn her release from detention  a purge option. CP (23211-5-III) at 80-81.
¶ 45 I would hold that a judge has the inherent power to impose detention in a civil contempt proceeding and need not expose youth to criminal proceedings before exercising this power. This holding is most consistent with the inherent authority of courts to enforce their orders and the intent of the legislature to reduce the number of criminal charges brought in juvenile proceedings. Holding otherwise will tie the hands of trial courts by eliminating their authority to effectively enforce their orders. Accordingly, I respectfully dissent.
FAIRHURST and CHAMBERS, JJ., concur.
NOTES
[1] In 1995, the Washington Legislature passed a bill known as the "Becca Bill," which amended the Family Reconciliation Act (chapter 13.32A RCW) to provide parents of runaway children a tool to control them through the legal system. See Alison G. Ivey, Comment, Washington's Becca Bill: The Costs of Empowering Parents, 20 Seattle U.L.Rev. 125 (1996); Laws of 1995, ch. 312. A later amendment, known as the "Becca Too" bill added the current "remedial" contempt sanction to RCW 13.34.165. See Ivey, supra; Laws of 1996, ch. 133. Because of this, the imposition of remedial contempt sanctions with a purge condition is known as the "Becca procedure" or "Becca sanctions."
[2] The Court of Appeals opinion addressed four orders: one involving Y.H., two involving M.H.-O., and one involving the third juvenile, A.K. Commissioner Inouye had sentenced A.K. to 60 days in detention, without a purge option, for running away from her placement a fifth time. That sentence, like the others, was imposed pursuant to the juvenile court's inherent contempt power.
[3] Because the Court of Appeals vacated A.K.'s order, only Y.H. and M.H.-O. petitioned this court for review.
[4] In the first scenario, summary adjudication is appropriate. Bagwell, 512 U.S. at 832, 114 S.Ct. 2552; Keller, 52 Wash.2d at 87, 323 P.2d 231. In the second, the contemnor must be given notice, a reasonable time to prepare a defense, and hearing before sanctions are imposed. Bagwell, 512 U.S. at 832, 114 S.Ct. 2552; In re Marriage of Nielsen, 38 Wash.App. 586, 589, 687 P.2d 877 (1984). Before punitive sanctions may be imposed, the contemnor must receive full criminal due process. Bagwell, 512 U.S. at 833, 114 S.Ct. 2552; see also In re Pers. Restraint of King, 110 Wash.2d 793, 800, 756 P.2d 1303 (1988).
[5] Status offenders are juveniles "who are before the court because their behavior endangers their welfare," including runaways such as M.H.-O. and Y.H.M.B., 101 Wash.App. at 434, 3 P.3d 780 (citing Jan C. Costello & Nancy L. Worthington, Incarcerating Status Offenders: Attempts to Circumvent the Juvenile Justice and Delinquency Prevention Act, 16 Harv. C.R.-C.L. L.Rev. 41, 42-46 (1981)).
[6] Contrary to the dissent's contention, this does not "abdicate [] the court's inherent power" by leaving enforcement of its orders to the discretion of the executive branch of government. Dissent at 24. The United States Supreme Court has previously recognized that courts are not stripped of their authority or inherent contempt power as a result of having to exercise that power through a separate criminal trial. See Bagwell, 512 U.S. at 838-39, 114 S.Ct. 2552 (holding that the imposition of some procedural burdens, such as the requirement of a jury trial, on inherent judicial contempt power does not prevent the courts from exercising that authority through a criminal trial); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 451, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (holding that "a separate and independent proceeding at law for criminal contempt" can "vindicate the authority of the court"). Courts are also not constrained by the criminal contempt statute to wait for a prosecutor to decide to take action. RCW 7.21.040(2)(c) allows the judge whose order was violated to request that an action be commenced and "appoint a special counsel to prosecute [the] action," if "required for the administration of justice." This is consistent with the United States Supreme Court's determination that the contempt power of the courts "necessarily encompasses the ability to appoint a private attorney to prosecute the contempt." Young, 481 U.S. at 793, 107 S.Ct. 2124.
[1] Studies indicate that up to 80 percent of children in foster care require mental health services. See American Academy of Child & Adolescent Psychiatry, Policy Statement: Psychiatric Care of Children in the Foster Care System (2001), available at http://aacap.org/cs/root/policy_statements/psychiatric_care_of_children_in_the _foster_care_system (last visited Dec. 10, 2007).
[2] See, e.g., Kelly Dedel, Office of Community Oriented Policing Services, U.S. Dep't of Justice, Juvenile Runaways (Feb.2006), available at http://www.popcenter.org/Problems/PDFs/Juvenile Runaways.pdf; Marni Finkelstein et al., Youth Who Chronically AWOL From Foster Care: Why They Run, Where They Go, and What Can Be Done, Vera Institute of Justice (Aug.2004), available at http://www.vera.org/publication_pdf/244_460.pdf; Kevin M. Ryan, Stemming the Tide of Foster Care Runaways: A Due Process Perspective, 42 Cath. U.L.Rev. 271, 279 (1993); Caren Kaplan, Children Missing from Care: An Issue Brief, Child Welfare League of America (2004), available at http://www.cwla.org/programs/fostercare/childmiss.htm (last visited Dec. 10, 2007).